IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AVITECH, LLC                          :
                                      :
v.                                    :   Civil No. WMN-04-3082
                                      :
EMBREX, INC.                          :
                                      :

## MEMORANDUM

Before the Court are Plaintiff's Motion for Summary Judgment of Noninfringement and Invalidity (Paper No. 97); Defendant's Motion for Summary Judgment of Patent Infringement and Validity (Paper No. 102); and Defendant's Motion to Strike the Declaration of Dr. Charles A. Garris, Jr. (Paper No. 103).[1]  All motions have been exhaustively briefed and are ripe for decision.  Upon a review of the pleadings and applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that all motions will be denied.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant Embrex claims that Plaintiff Avitech infringes Embrex's U.S. Patent No. 5,136,979 ("the '979 Patent").  The '979 Patent is entitled Modular Injection System for Avian Embryos and relates to an apparatus used for injecting a vaccine into poultry eggs.  The general object of the '979 patent is "to provide an apparatus and an associated method for injecting a plurality of

_____

[1]  Avitech has filed a Sur-Reply to Embrex's Reply Brief in Further Support of Summary Judgment of Patent Infringement and Validity.  Paper No. 111.  The Court will consider this Sur-Reply as a motion for leave to file a sur-reply and accept the pleading in accordance with Local Rule 105.2(a).  The Court has also read and considered Embrex's submission of an Opposition to Avitech's Sur-Reply.  Paper No. 112.

eggs with an appropriate injection device wherein each injection needle may be aligned with an egg not only with respect to the height of individual eggs, but also with eggs that may be misaligned with respect to the vertical, and still deliver a desired fluid as accurately and precisely as possible into each egg." '979 Patent, Col. 2, lines 46-54.  Embrex claims that, in July 2004, Avitech began marketing an injection device for avian eggs under the name "Intelliject®" which infringes the '979 patent.

On August 10, 2006, the Court denied Embrex's motion to modify the scheduling order to include claim construction briefing prior to the deadline for summary judgment motions, finding that greater efficiency would result from combining claim construction with summary judgment.  Thus, prior to deciding the pending motions for summary judgment, the Court must construe the contested claims of the '979 Patent.  The '979 Patent contains 21 claims, however, Embrex alleges infringement only of claims 1-3 and 10-12.[2]  Claims 2, 3, 10, 11, and 12 are each dependent upon claim 1.  Thus, to infringe these dependent claims, the Intelliject® machine must infringe claim 1, as well as any additional limitations found in the dependent claims.  See Oak

_____

[2]  While Avitech admits that Embrex's supplemental response to interrogatory No. 7 contained a chart of contested claims which included claim 3, Avitech asserts that Embrex has failed to expressly or consistently contend infringement of claim 3.  The Court finds that Embrex has sufficiently asserted a claim of infringement with regard to claim 3, noting that infringement of claim 3 is wholly dependent on the Court's finding of infringement with regard to claim 2, the validity of which Avitech agrees has been properly raised.

Technology, Inc. v. U.S. Int'l Trade Comm'n, 248 F.3d 1316, 1323

n.4 (Fed. Cir. 2001).  Claim 1 provides as follows:

> 1.  An injection apparatus that is
> particularly suitable for accurate and
> precise injection of eggs to the same depth
> and location when the eggs are of varying
> sizes and may be presented to the injection
> apparatus in somewhat different orientations,
> said injection apparatus comprising:
>
> a generally horizontally oriented tooling
>     plate with an opening therethrough;
>
> an injector resting generally vertically in
>     said opening in said tooling plate with
>     a lower portion of said injector
>     depending downwardly below said tooling
>     plate and an upper portion of said
>     injector resting at or above said
>     tooling plate; and
>
> means for raising and lowering said
>     tooling plate and said injector
>     therewith so that when said plate is
>     lowered and said lower portion of said
>     resting injector contacts an object such
>     as an egg to be injected, said resting
>     injector stops while said tooling plate
>     proceeds downwardly until said injector
>     disengages from said tooling plate and
>     is free to move in a translational
>     direction independent of said tooling
>     plate, and so that when said tooling
>     plate is raised it reengages said
>     injector and carries it upwardly and
>     away from the object being injected.

Claims 2, 3, 10, 11, and 12 provide:

> 2. An injection apparatus according to claim
> 1 and further comprising means for aligning
> an object to be injected beneath said
> injector resting in said tooling plate.
>
> 3. An injection apparatus according to claim
> 2 wherein said object aligning means
> comprises means for aligning an egg beneath
> said injector resting in said tooling plate.
>
> 10. An injection apparatus according to claim

1 wherein:

said lower portion of said injector is
    circular in cross section; and

said opening in said tooling plate is
    circular and has a diameter somewhat
    larger than the diameter of said
    circular cross section of said lower
    portion for permitting said lower
    portion of said injector to move in
    translational fashion within said
    opening in said tooling plate and to
    thereby move in translational fashion
    with respect to an egg therebeneath.

11. An injection apparatus according to claim
1 comprising a plurality of openings in said
injection plate and a plurality of injectors,
with one injector resting in each respective
opening.

12. An injection apparatus according to claim
1 and further comprising means for delivering
a fluid to be injected from a supply to said
injector.

The points of contention focus primarily on the terms
composing the final paragraph of claim 1.  Specifically, the
parties differ as to the meaning of the terms "disengages," "free
to move in a translational direction independent of said tooling
plate," and "reengages."  The parties also differ as to whether
the entirety of the final paragraph should be construed as a
means-plus-function limitation in accordance with 35 U.S.C. §
112, ¶ 6.[3]

_____

   [3]  Section 112, ¶ 6 provides "An element in a claim for a
combination may be expressed as a means or step for performing a
specified function without the recital of structure, material, or
acts in support thereof, and such claim shall be construed to
cover the corresponding structure, material, or acts described in
the specification and equivalents thereof."

## II.  LEGAL STANDARD FOR CLAIM CONSTRUCTION

Claim construction is a question of law, to be determined by the Court.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  In construing an asserted claim, the Court will first consider the intrinsic evidence of record, namely, the claims themselves, the patent specification, and the prosecution history.  See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1584 (Fed. Cir. 1996).

The words of a claim are generally given their "ordinary and customary meaning[,]" which is the meaning that "the term would have to a person of ordinary skill in the art in question at the time of the invention[.]"  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  A patentee, however, may choose to use terms in a manner other than their ordinary meaning, provided that the definition of the term is clearly stated in the patent specification or the file history.  Vitronics, 90 F.3d at 1582.  Further, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  Phillips, 415 F.3d at 1314.

In addition to the claim terms themselves, the Court will look to the patent specification to interpret the words or phrases of a patent claim.  Id. at 1315.  The specification "is the single best guide to the meaning of a disputed term."  Id. (quoting Vitronics, 90 F.3d at 1582); see also Markman, 52 F.3d at 979 ("Claims must be read in view of the specification, of

which they are a part."). "The importance of the specification language in claim construction derives from its statutory role." Phillips, 415 F.3d at 1316 (noting that 35 U.S.C. § 112 requires that a patent specification include a description of the claims in "full, clear, concise, and exact terms").

The final tier of intrinsic evidence guiding the construction of claims is the prosecution history of the patent. Id. at 1317. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.; see also Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) (finding that the prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution").

While less significant than intrinsic evidence, the Court may also rely on extrinsic evidence in interpreting patent claims. Phillips, 415 F.3d at 1317. Extrinsic evidence "consists of evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Consideration of extrinsic evidence "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of intrinsic evidence." Phillips, 415 F.3d at 1319.

**III.  CONSTRUCTION OF THE '979 PATENT**

6

**A. Disengages**

The parties first disagree over the construction of the term "disengages" as it is used in the final paragraph of claim 1.[4] The relevant portion of the claim provides "when said [tooling] plate is lowered and said lower portion of said resting injector contacts an object such as an egg to be injected, said resting injector stops while said tooling plate proceeds downwardly until said injector disengages from said tooling plate and is free to move in a translational direction independent of said tooling plate . . . ."  '979 Patent, Col. 8, lines 58-65.

Avitech argues that the term "disengages" should be interpreted to require that "the tooling plate ceases to contact, support, confine or control the injector in any way, allowing the injector complete freedom to move laterally, as well as vertically, without mechanical interference."  Avitech Mot. for Summ. J. 18.  Avitech claims that the patent specification further requires that "disengagement takes place only after the injector strikes an object such as an egg and then stops, and only after the tooling plate proceeds further downwardly."  Id. at 19 (emphasis in original).

_____

[4] Embrex suggests that an interpretation of the phrase "an injector resting" in claim 1 is also required.  '979 Patent, Col. 8, line 52.  Avitech submits that no construction of that phrase is necessary.  Because Embrex's suggested interpretation is nearly a verbatim recitation of the relevant paragraph of claim 1 and adds no new meaning to the term beyond the language of that paragraph, the Court will refrain from engaging in an interpretation of the phrase.  See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (noting that "only those terms need to be construed that are in controversy, and only to the extent necessary to resolve the controversy").

Embrex argues that "disengages" simply refers to the point at which the "injector is no longer at rest on the tooling plate." Embrex Mot. for Summ. J. 8. Under Embrex's reading, disengagement occurs at the moment the tip of the injector contacts the egg, prior to the tooling plate proceeding downwardly to the lower portion of the injector. Id. at 9.

The Court disagrees with Embrex's construction of the term "disengages." The language of claim 1 makes clear that the point of disengagement does not occur until the tooling plate has proceeded downwardly to the lower, more narrow section of the injector. Specifically, claim 1 notes that, once the lower portion of the injector contacts the egg, "said resting injector stops while said tooling plate proceeds downwardly until said injector disengages from said tooling plate and is free to move in a translational direction . . . ." '979 Patent, Col. 8, lines 58-63 (emphasis added). The emphasized language above clarifies that the moment of disengagement occurs not just once the injector has reached the egg, but once the injector has reached the egg and the tooling plate has proceeded downward, sufficient to free the injector to engage in translational motion. The specification language reinforces the finding that the moment of disengagement is the moment when the tooling plate has descended to the lower portion of the injector. See, e.g., Id. at Col. 3, lines 58-65 ("When the tooling plate 20 is lowered and the lower portion 23 of the resting injector 22 strikes an object such as an egg to be injected, the injector 22 stops while the tooling

8

plate 20 proceeds downwardly until the injector 22 disengages
from the tooling plate 20.  <u>At this point</u>, the injector 22 is
free to move in a translational direction independent of the
tooling plate 20 . . . .") (emphasis added); Col. 6-7, lines 63-
03 ("At [the point at which the punch guide 43 strikes the egg
64], the previously resting injector 22 is free to stop while the
tooling plate 20 proceeds further downwardly until the injector
22 disengages from the tooling plate 20.  <u>At this further point</u>,
the injector 22 is free to move in a translational direction . .
. .") (emphasis added).  The prosecution history also supports
this interpretation.  <u>See</u> Avitech Mot. for Summ. J. Ex. 2, Notice
of Allowability, p.2, March 19, 1992 ("The prior art failed to
teach the use of an injector vertically resting in an opening of
a movable tool plate wherein the resting injector stops as the
tooling plate proceeds downwardly <u>until the injector disengages</u>
from the tool plate and is free to move in a translational
direction independent of said tooling plate.") (emphasis added).

Thus, the Court construes the term "disengages" to refer to
the point at which the injector has contacted the egg <u>and</u> the
tooling plate has proceeded downwardly to the lower portion of
the injector, allowing the injector the freedom to move in a
translational direction independent of said tooling plate.

**B. Freedom to Move in a Translational Direction**

The parties also disagree as to the meaning of the phrase
"free to move in a translational direction independent of said
tooling plate" as it appears in the final paragraph of claim 1.

9

The disagreement over the interpretation of this phrase concerns what constitutes the injector's independence from the tooling plate and what amount of motion, if any, qualifies as "free to move in a translational direction."

Embrex contends that the phrase describes the freedom of movement allowed by the difference in size between the opening in the tooling plate and the resting injector <u>at the point</u> where the injector contacts the egg.  Importantly, Embrex argues that the freedom of translational motion exists prior to the tooling plate's descent to the lower, narrower portion of the injector, and, therefore, prior to what the Court has defined as the point of disengagement.  <u>See</u> Embrex Mot. for Summ. J. 9-11.  To support its interpretation, Embrex relies on specification language which reads: "<u>At this point</u>, each injector is free to stop at a position defined by the top of each individual egg, and each injector <u>is further free to move translationally</u> to the extent permitted by the difference between the size of the opening in the tooling plate and the smaller size of the injector."  <u>Id.</u> at 12 (quoting '979 Patent, Col. 8, lines 21-24) (emphasis added by Embrex).  Embrex contends that the "point" referred to in the above quotation is the point at which the injector contacts the egg.  A closer reading of the language preceding the above quotation, however, clarifies that the "point" referred to is the point, following the injector's contact with the egg, at which the tooling plate has descended to the lower, more narrow portion of the injector, thus allowing freedom of motion between the

10

narrower portion of the injector and the relatively larger

opening in the tooling plate.

The paragraph in which the above quoted language appears

provides:

> In addition to its structural aspects, it
> will be understood that in another aspect the
> invention is a method of accurately and
> precisely injecting a plurality of eggs of
> different sizes and in which the eggs may be
> at least partially vertically misoriented.
> The method comprises positioning a plurality
> of egg injectors in a corresponding plurality
> of openings in a tooling plate, and without
> fixing the injectors to the plate. Portions
> of the injectors are smaller than the
> openings in the tooling plate. A plurality
> of eggs are positioned in substantial
> alignment beneath the injectors. The tooling
> plate is then lowered along with the
> injectors until the injectors contact the
> eggs and stop while the tooling plate is
> further lowered until the injectors no longer
> rest in the tooling plate. At this point
> each injector is free to stop at a position
> defined by the top of each individual egg,
> and each injector is further free to move
> translationally to the extent permitted by
> the difference between the size of the
> opening in the tooling plate and the smaller
> size of the injector.

'979 Patent, Col. 8, lines 11-25 (emphasis added).  The above

emphasized language teaches that the injector's freedom to move

translationally is the result of the tooling plate's descent to

the more narrow portion of the injector.  Only when the tooling

plate reaches the more narrow section of the injector does

sufficient differential exist between the size of the injector

and the opening in the tooling plate to allow the described

translational movement.  See also id. at Col. 9, lines 45-55

(claiming "[a]n injection apparatus according to claim 1 wherein:

said lower portion of said injector is circular in cross section;
and said opening in said tooling plate is circular and has a
diameter somewhat larger than the diameter of said circular cross
section of said lower portion for <u>permitting said lower portion
of said injector to move in translational fashion within said
opening in said tooling plate</u> and to <u>thereby</u> move in
translational fashion with respect to an egg therebeneath")
(emphasis added).

    Embrex's argument that the translational movement
contemplated by the patent can occur when the upper portion of
the injector is resting in the engaged tooling plate is
unsupported by the language of the patent specification.  Nowhere
in the patent specification is translational movement mentioned
where the injector is at rest in the tooling plate.  Conversely,
the specification teaches that translational motion occurs only
where the relatively large difference in diameter between the
opening in the tooling plate and the lower portion of the
injector allows such movement.  <u>See</u>, <u>e.g.</u>, '979 Patent, Col. 4-5,
lines 59-06 ("[O]ne of the objects of the invention is to provide
a means by which the portion of the injector that meets an egg
can move in a translational fashion, as well as in a vertical
fashion.  Part of the means for accomplishing this include the
relationship between the lower portion 23 of the injector 22 and
the openings 21 in the tooling plate 20.  As illustrated in FIG.
3, the lower portion 23 of the injector, particularly the punch
guide 43, is circular in cross-section.  The opening 21 in the

12

tooling plate 20 is also circular and has a diameter somewhat larger than the diameter of the circular cross-section of the lower portion 23.  The respective difference in size between the opening 21 and the injector 22 permits the lower portion 23 of the injector 22 to move in translational fashion within the opening 21 in the tooling plate (FIG. 5)." ).

No intrinsic evidence exists which would provide a specific numerical description of the amount of translational motion allowed by the difference between the size of the opening in the tooling plate and the size of the lower portion of the injector. Avitech argues that an ordinary artisan would construe "freedom to move translationally" to incorporate movement "sufficient to allow the injector to orient itself with respect to the top of the egg." Avitech Mot. for Summ. J. 24.  Embrex contends that any difference in the size of the opening in the tooling plate and the size of the injector at any point in the injection cycle, even the distance which exists when the tooling plate is engaged and the injector is at rest, defines the amount of translational movement referred to in claim 1.

To support its interpretation, Embrex quotes a portion of the specification which provides that "[a]lthough the translational movement of the injectors 22 is limited to some extent by the size of the openings 21 and 51, the translational movement available is sufficient given the generally vertical (if often slightly tilted) presentation of eggs in a typical tray or flat.  Indeed, some limitation in the range of movement can be

useful in keeping the overall operation of the apparatus accurate and precise." Embrex Mot. for Summ. J. 11 (quoting '979 Patent, Col. 7, lines 25-32). The Court finds that this language supports a broader interpretation of the claim phrase than that proposed by Embrex. While the amount of translational movement allowed at the point of disengagement is confined by the difference in size between the openings in the tooling plate and the injector, the specification makes clear that the clearance at the point of disengagement is designed specifically to allow non-vertical motion. Neither party disputes, and common sense suggests, that some amount of clearance must exist to make it possible for an object to fit vertically through an opening. An object may engage in a de minimis amount of translational motion even where the smallest possible clearance exists between the object and the opening. Claim 1, however, provides for a relatively substantial amount of translational movement beyond that which might occur where an object is designed to move through an opening in a strictly vertical direction.

While Embrex maintains that no specified quantity of movement is required in interpreting the claims of the patent, it has acknowledged that the "specification . . . teaches that the clearance is that which permits the injectors to align to 'slightly titled' eggs . . . ." Embrex Reply Br. 21. Embrex also notes that "[t]he specification evidences that a person of ordinary skill in the art would draw the line between a clearance that permits vertical only movement versus a clearance that has

14

both vertical and translational motion." <u>Id.</u>  Intrinsic evidence supports the contention that "free to move in a translational direction" encompasses a broader range of motion than that which might be possible in a clearance designed to permit vertical only movement.  <u>See, e.g.,</u> '979 Patent, Col. 1, lines 10-13 (noting that each injector "can orient itself both horizontally and vertically to an individual egg even where the eggs are of different sizes and may be presented in slightly different orientations"); Col. 2-3, lines 67-04 ("When the injector disengages from the tooling plate, it is free to move in a translational direction independent of the tooling plate to therefore more accurately meet the top portion of an egg that may be partially misaligned with respect to the vertical."); Col. 7, lines 25-29 ("Although the translational movement of the injectors 22 is limited to some extent by the size of the openings 21 and 51, the translational movement available is sufficient given the generally vertical (if often slightly tilted) presentation of eggs in a typical tray or flat.").

Thus, the Court finds that an ordinary artisan would understand the phrase "free to move in a translational direction independent of said tooling plate" to mean that the injector is free to engage in the lateral movement allowed by the clearance between the lower portion of the injector and the opening in the tooling plate, beyond the <u>de minimis</u> amount of movement which may

occur in a clearance designed to permit vertical only movement.[5]

**C. Reengages**

The meaning of the term "reengages" in claim 1 is illuminated by the Court's foregoing construction of the term "disengages." Claim 1 provides that "when said tooling plate is raised it reengages said injector and carries it upwardly and away from the object being injected." '979 Patent, Col. 8, lines 65-68. Embrex argues that "reengages" means "that when the tooling plate is raised it picks up the injector and carries the injector away from the object being injected." Embrex Mot. for Summ. J. 11. Under this defininiton, the tooling plate reengages only when the tooling plate carries the injector upward, not when the tooling plate meets the upper, broader portion of the injector, limiting the injector's ability to move translationally.

The Court finds that "reengages" means that the tooling plate moves from its disengaged position to its engaged position, i.e., the injector reengages at the point at which the tooling plate returns from its downward position (which allows the lower portion of the injector the freedom to engage in translational motion) to where it meets the upper portion of the injector so

---

[5] Avitech argues that, if a clearance sufficient to allow vertical only motion is interpreted by the Court also to constitute clearance sufficient to allow translational motion, then the '979 Patent would be invalid as insufficiently disclosed or invalid as anticipated by prior art. Because the Court has distinguished clearances which provide for vertical only movement from those which allow translational movement, the Court refrains from ruling on Avitech's arguments concerning invalidity.

that the upper portion of the injector is resting generally
vertically in the opening in the tooling plate.  The Court notes
that, while reengagement may occur simultaneously with the
carrying of the injector upward, reengagement is not defined by
that action.  The claim language illustrates the distinction
between the act of reengagement and the act of carrying the
injectors upward by using the word "and" to separate these two
functions: "[the tooling plate] reengages said injector and
carries it upwardly and away from the object being injected."
Id.; see also id. at Col. 10, lines 40-43 ("when said tooling
plate is raised it reengages said injector and carries it
upwardly and away from the object being injected.").

   D. **"Means-Plus-Function" Limitation**

   "An element in a claim for a combination may be expressed as
a means or step for performing a specified function without the
recital of structure, material, or acts in support thereof, and
such claim shall be construed to cover the corresponding
structure, material, or acts described in the specification and
equivalents thereof."  35 U.S.C. § 112, ¶ 6.  It is well settled
that "[a] claim limitation that actually uses the word 'means'
invokes a rebuttable presumption that § 112, ¶ 6 applies."  CCS
Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir.
2002).  Construction of a means-plus-function limitation involves
two steps.  Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,
296 F.3d 1106, 1113 (Fed. Cir. 2002).  The court must identify
the claimed function and then determine what structure, if any,

disclosed in the specification corresponds to the claimed
function.  Id.  "The court must construe the function of a means-
plus-function limitation to include the limitations contained in
the claim language, and only those limitations."  Id.  For a
structure to qualify as corresponding, it must perform the
claimed function and the specification must clearly associate the
structure with performance of the function.  Id.  If a patentee
phrases a claim term in a means-plus-function format, the term
"will cover nothing more than the corresponding structure or step
disclosed in the specification" as well as that step or
structure's equivalents.  CCS Fitness, Inc., 288 F.3d at 1367.

### 1. The Claimed Function

The final paragraph of claim 1 is written in the means-plus-
function format which implicates 35 U.S.C. § 112, ¶ 6.  Embrex
argues, however, that the claimed function created by the "means
for" language is limited only to the "means for raising and
lowering said tooling plate and said injector therewith[.]"  To
support its argument, Embrex contends that the remaining language
in claim 1 refers to structural elements that are not written in
a functional format, negating the applicability of § 112, ¶ 6 to
those elements.  See Wenger Mfg., Inc., 239 F.3d at 1232 ("[E]ven
when a limitation does recite a function, if it also recites a
sufficiently definite structure for performing that function,
then § 112, ¶ 6 does not apply.").  Embrex further argues that
the specification language supports its limited interpretation
the claimed function.  Embrex Mot. for Summ. J. 12-13 (citing

'979 Patent, Col. 3, lines 55-58: "The invention includes means, shown as the cylinder 25, cylinder shaft 26, horizontal frame member 27, and upright shafts 28, for raising and lowering the tooling plate 20 and the injectors 22 therewith.").  Thus, Embrex contends that the structural elements corresponding to the claimed function are limited to the cylinder, cylinder shaft, horizontal frame member, and upright shafts associated in the patent with raising and lowering the tooling plate and the injectors.

The Court disagrees with Embrex's interpretation of the final paragraph of claim 1 and instead finds that the structural description of the relationship of the injectors to the tooling plate contained in the final paragraph of claim 1 serves merely to specify the claimed function of the means-plus-function language.  See Laitram Corp. v. Rexnard, Inc., 939 F.2d 1533, 1536 (Fed. Cir. 1991) ("The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6).").[6]  These structural elements describe what occurs during the raising and lowering of the tooling plate and

_____

[6]   In Laitrim, the Court found the following language required an interpretation consistent with § 112, ¶ 6: "means for joining said pluralities [of link ends] to one another so that the axes of said holes of said first plurality are arranged coaxially, the axes of said holes of said second plurality are arranged coaxially and the axes of respective holes of both pluralities of link ends are substantially parallel . . . ." Laitrim, 939 F.2d at 1535.  The Court reasoned that, though the means clause contained a structural description, the description "merely serves to further specify the function of that means. The recited structure tells only what the means-for-joining does, not what it is structurally."  Id. at 1536 (emphasis in original).

the injectors; they do not describe the structure of the tooling plate and the injectors themselves.  This finding becomes clear when the general language in claim 1 is compared with the more detailed description of what compromises the structure of the tooling plates and injectors contained in the patent specification.[7]  Because the structural recitations included in the final paragraph of claim 1 do not sufficiently elaborate the entire structure and material required to raise and lower the tooling plate in a manner that allows for translational motion, those recitations fail to negate the application of § 112, ¶ 6. Cf. Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1427 -1428 (Fed Cir. 1997) ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format.").

Additionally, the language of the specification supports the contention that the claimed function incorporates raising and

---

[7]  In describing the specific structural characteristics of the tooling plate and injectors which allow for translational movement, the specification provides "one of the objects of the invention is to provide a means by which the portion of the injector that meets an egg can move in a translational fashion, as well as in a vertical fashion.  Part of the means for accomplishing this include the relationship between the lower portion 23 of the injector 22 and the openings 21 in the tooling plate 20.  As illustrated in FIG. 3, the lower portion 23 of the injector, particularly the punch guide 43, is circular in cross-section.  The opening 21 in the tooling plate 20 is also circular and has a diameter somewhat larger than the diameter of the circular cross-section of the lower portion 23.  The respective difference in size between the opening 21 and the injector 22 permits the lower portion 23 of the injector 22 to move in translational fashion within the opening 21 in the tooling plate (FIG. 5)."  '979 Patent, Col. 4-5, lines 59-06.

lowering the tooling plate and injectors in such a way that provides for disengagement, freedom of translational motion, and reengagement.  <u>See</u> '979 Patent, Col. 4, line 2 (referring to the process of lowering the injectors, allowing the injectors to engage in translational movement, and subsequently raising the injectors as a single "sequence of operation"); Col. 2-3, lines 61-06 ("Means are included for raising and lowering the tooling plate and the injector therewith so that when the plate is lowered and the lower portion of each resting injector contacts an object such as an egg, the resting injector stops and disengages from the tooling plate while the tooling plate proceeds downwardly.  When the injector disengages from the tooling plate, it is free to move in a translational direction independent of the tooling plate to therefore more accurately meet the top portion of an egg that may be partially misaligned with respect to the vertical.  When the tooling plate is raised, it reengages the injector and carries it upwardly and away from the egg.").

Thus, the Court finds that the entire final paragraph of claim 1 constitutes the claimed function for purposes of § 112, ¶ 6, and that the structural language included in that paragraph serves merely to specify the claimed function.

### 2. The Corresponding Structure

Looking to the '979 Patent specification, the structure corresponding to the claimed function in the final paragraph of claim 1 is described as follows:

The invention includes means, shown as the cylinder 25, cylinder shaft 26, horizontal frame member 27, and upright shafts 28, for raising and lowering the tooling plate 20 and the injectors 22 therewith.  When the tooling plate 20 is lowered and the lower portion 23 of the resting injector 22 strikes an object such as an egg to be injected, the injector 22 stops while the tooling plate 20 proceeds downwardly until the injector 22 disengages from the tooling plate 20.  At this point, the injector 22 is free to move in a translational direction independent of the tooling plate 20 to seek and come to rest upon the top most portion of an egg, even if that egg is slightly tilted.  When the tooling plate 20 is raised, it reengages the injector 22, straightens the injector 22 with respect to the vertical, and carries it upwardly and away from the object being injected.  This sequence of operation is perhaps best illustrated by a combination of FIGS. 3, 5 and 6.

'979 Patent, Col. 3-4, lines 55-04.

## IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact.  Id. at 323.  The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor."  Felty v.

22

Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

When both parties move for summary judgment, the Court applies the same standard of review.  Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991); ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 45 n.4 (4th Cir. 1983)("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment -- even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720).

## V.  INFRINGEMENT

A determination of infringement requires a two-step analysis.  Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1476 (Fed. Cir. 1998).  "First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process."  Id. (quoting Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993)).  To prove a claim of literal infringement, the moving party must show "that every limitation of the patent claim be found in the accused device."  Gen. Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 981 (Fed. Cir. 1997).

The Federal Circuit has designated a specific inquiry for determining infringement of a means-plus function-claim. "Literal infringement of a means-plus function claim requires that the accused device have structure for performing the identical function recited in the claim." Wegner Mfg., Inc. v. Coating Machinery Systems, Inc., 239 F.3d 1225, 1238 (Fed. Cir. 2001).  Additionally, "the structure of the accused device must be either identical or equivalent to the corresponding structure in the specification."  Id.; see also Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999) ("Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.").

Avitech claims that no material dispute exists as to the operation of the accused Intelliject® machine.  As a result, Avitech asserts that it is entitled to summary judgment of noninfringement because the injectors on the Avitech machine do not disengage from their support plate, they are not free to move in a translational direction independent of that plate, and the support plate does not reengage the injectors, carrying them upwardly following injection.  Avitech claims that the support plate of the Inelliject® machine, the analog to the tooling plate described in the '979 Patent, does not "disengage" in accordance with the proper construction of that term and that the Inelliject® injectors are never free to move in a translational

24

direction.  Avitech admits that, in the Intelliject® machine,
"[a]s the support plate is lowered and the injectors hit the egg,
the support plate continues downward in movement."  Avitech Mot.
for Summ. J. 34.  Avitech distinguishes this action from the
disengagement described in the '979 Patent by noting that the
"Avitech injector does not separate from the support plate . . .
the Avitech injectors are at all times in contact with the
support plate and confined within the support plate openings."
Avitech Opp'n. 20.  Under Avitech's account of the operation of
the Intelliject® machine, the amount of separation between the
opening in the support plate and the lower portion of the
injectors is sufficient only to allow vertical movement, and
insufficient to allow the injectors the freedom to move in a
translational direction.

To support its contention that the Intelliject® machine
allows clearance sufficient only for vertical movement of its
injectors, Avitech relies on the nominal clearance distance
between the lower portion of the injector and the openings in the
support plate.  Avitech's expert, Dr. Charles A. Garris,
estimates this difference as "approximately the thickness of five
human hairs."  Avitech Mot. for Summ. J. 31.[8]  Avitech also notes

_____

[8]  Embrex's motion to strike the declaration of Dr. Garris,
Paper No. 103, claims that his opinion testimony constitutes
improper extrinsic evidence, that his opinions are unsupported by
sufficient facts or data, and that he is not qualified under Rule
702 of the Federal Rules of Evidence to offer expert testimony,
particularly with respect to his opinion regarding the potential
invalidity of the '979 Patent.  First, as stated above, while
less significant than intrinsic evidence, the Court may rely on
extrinsic evidence in interpreting patent claims.  Phillips, 415

that the lower end of the Intelliject® injectors are covered with a stabilizing nipple which further prevents the injectors from engaging in any non-vertical movement.  Finally, Avitech argues that, once the Intelliject® injectors contact the egg and the support plate ceases to move downwardly, gripper rings inflate to surround each injector body causing any potentially misaligned injector to return to a purely vertical position.  As a result of these design features, Avitech contends that the accused support plate is incapable of disengagement or reengagement and that the accused injectors are incapable of translational movement.  Thus, Avitech argues that both the function and the structure of the Intelliject® machine vary substantially from the claims of the '979 Patent.

Embrex challenges Avitech's description of the operation of the accused Intelliject® machine.  Relying on Avitech's published patent application for the Intelliject® (now abandoned), deposition testimony of Avitech engineers and manufacturers, and discovered Avitech documents, Embrex argues that the Intelliject®

---

F.3d at 1317.  Second, the Court finds that, based on his background, experience, training, and research, Dr. Garris is qualified to testify competently regarding the technology, structure, and function of the Intelliject® machine.  See Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) (noting that the test for exclusion of expert testimony is strict and that "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.").  Because the Court does not rely on Dr. Garris' opinion regarding the operation of the Embrex machine or any opinion he may have offered regarding the validity of the '979 Patent, the Court refrains from determining the propriety of a motion to strike with regard to those issues.

machine performs an identical function to the '979 Patent claims

and that it is identical or equivalent to the structure described

in the '979 Patent.[9]  Specifically, Embrex contends that, once

the support plate on the Intelliject® machine has descended and

the injectors are resting vertically on the eggs, the injectors

are free to engage in a significant amount of translational

motion.  Embrex presents evidence indicating that the actual

clearance which exists between the openings in the support plate

and the lower portion of the Avitech injectors varies from the

claimed nominal distance, and that the actual clearance is

sufficient to allow for the translational movement contemplated

by the '979 Patent.  Embrex claims that measurements taken by its

own expert show that the Inelliject® injectors engage in

translational motion which corresponds to forty percent of the

translational motion of the injectors in the Embrex machine.

Embrex further contends that photographs and videotaped

inspections of the accused Inelliject® machine indicate that

---

[9]   In its sur-reply, Avitech contends that Embrex may not
raise a claim under the doctrine of equivalents, noting that
Embrex's relevant interrogatory responses asserted only literal
infringement.  Embrex has presented evidence that it had raised
the doctrine of equivalents in its reply to the relevant Avitech
interrogatories and argues that, because Avitech did not seek
summary judgment under the doctrine of equivalents, it had no
reason to raise the doctrine in its opposition.  See Embrex Opp'n
to Sur-Reply, Exs. C and D.  The Court finds that Embrex has not
waived its opportunity to prove whether Avitech infringed under
the doctrine of equivalents, particularly in light of the fact
that the Court has adopted a construction of the disputed claim
language that does not comport exactly with either party's
suggested construction, upon which the parties based their
arguments for summary judgment.  See Wright Med. Tech., Inc. v.
Osteonics Corp., 122 F.3d 1440, 1445 (Fed Cir. 1997).

substantial translational motion occurs beyond the amount which
would occur if the difference in the size of the support plate
openings and the Inelliject® injectors were limited to the
clearance sufficient to allow vertical only movement.  Finally,
Embrex contends that, following injection, the support plate of
the Intelliject® machine reengages the top portion of the
injectors and carries them upwardly.  Based on this evidence,
Embrex contends that the Intelliject® machine infringes each
element of claim 1 of the '979 patent, as well as the dependent
claims.

The Court finds that sufficient issues of material fact
exist to deny each party's motion for summary judgment.  Evidence
offered by each party presents inconsistent conclusions as to the
actual functioning of the accused Intelliject® machine.  Because
the structure and function of the actual product, as opposed to
the nominal specifications of that product, control patent
infringement issues, the Court cannot rely on nominal
specifications provided by Avitech's expert regarding the
Intelliject® machine.  Thus, taking the facts in the light most
favorable to Embrex, it is possible that a reasonable jury could
find that the Intelliject® machine provides a function identical
to that described in the '979 Patent and that the structure of
the Intelliject® machine is either "identical or equivalent to
the corresponding structure in the specification."  Wegner Mfg.,
Inc., 239 F.3d at 1238.

Conversely, taking the facts concerning the structure and

function of the Intelliject® machine in the light most favorable

to Avitech, it is possible that a reasonable jury could find that

the Intelliject® machine fails to infringe on the properly

construed claims of the '979 Patent.  Avitech has presented

evidence that the Intelliject® machine functions differently from

claims of the '979 Patent, particularly with respect to whether

the Intelliject® injectors have the capability to move in a non-

vertical direction.  Additionally, Avitech has presented evidence

distinguishing the structure of the Intelliject® machine from the

structure contained in the '979 Patent, particularly with respect

to the function of the Intelliject® machine's support plate.

Because of the factual dispute concerning the structure and

function of the Intelliject® machine, summary judgment is

inappropriate.

## VI.  CONCLUSION

For the reasons set forth above, the Court construes the

disputed terms in the '979 Patent as follows:

* The term "disengages" refers to the point at which the

injector has contacted the egg and the tooling plate has

proceeded downwardly to the lower portion of the injector,

allowing the injector the freedom to move in a translational

direction independent of said tooling plate.

* The phrase "free to move in a translational direction

independent of said tooling plate" means that the injector is

free to engage in the lateral movement allowed by the clearance

between the lower portion of the injector and the opening in the

29

tooling plate, beyond the <u>de minimis</u> amount of movement which may occur in a clearance designed to permit vertical only movement.

* The term "reengages" means that the tooling plate moves from its disengaged position to its engaged position, i.e., the injector reengages at the point at which the tooling plate returns from its downward position (which allows the lower portion of the injector the freedom to engage in translational motion) to where it meets the upper portion of the injector so that the upper portion of the injector is resting generally vertically in the opening in the tooling plate.

Additionally, Plaintiff's Motion for Summary Judgment of Noninfringement and Invalidity and Defendant's Motion for Summary Judgment of Patent Infringement and Validity will be denied. Defendant's Motion to Strike the Declaration of Dr. Charles A. Garris, Jr. will be denied.  A separate order will follow.


                              _____/s/_____
                              William M. Nickerson
                              Senior United States District Judge

Dated: December 21, 2006