**REDACTED VERSION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

AVITECH, L.L.C.,           )
                        )
       Plaintiff,         )      Civil Action No.  WMN 04-CV-3082
                        )
v.                     )
                        )
EMBREX, INC.,          )
                        )
       Defendant.     )

## AVITECH'S OPPOSITION TO EMBREX'S MOTION
## FOR SUMMARY JUDGMENT ON AVITECH'S ANTITRUST CLAIM

Max  H. Lauten
Federal Bar No. 00288
KRAMON & GRAHAM, P.A.
One South St.
Suite 2600
Baltimore, MD 21202-3201
Tel.: (410) 752-6030
Fax: (410) 539-1269
Email: mlauten@kg-law.com


Philip L. O'Neill
Federal Bar No. 08303
Michael R. Slobasky
Harvey B. Jacobson, Jr.
JACOBSON HOLMAN PLLC
400 Seventh St., N.W.
Washington, D.C. 20004-2218
Tel.: (202) 626-4681
Fax: (202) 393-5350

Attorneys for Avitech, L.L.C.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... *v*

INTRODUCTION ....................................................................................................... 1

THERE IS SUFFICIENT EVIDENCE FOR A JURY TO FIND IN FAVOR
OF AVITECH ON EACH ELEMENT OF ITS CLAIMS OF MONOPOLIZATION
AND ATTEMPTED MONOPOLIZATION BY SHAM LITIGATION ............................. 2

    A.    UNDISPUTED EVIDENCE SHOWS THAT THE RELEVANT
            MARKET IS THE PROVISION OF AUTOMATED IN OVO
            VACCINE INJECTION MACHINES IN THE UNITED STATES ............. 3

            1.    The United States is the Relevant Geographic Market ...................... 3

            2.    The Relevant Product Market is the Provision of
                 Automated In Ovo Injection Machines ............................................. 4

                 a.    Relevant product markets, generally ...................................... 5

                 b.    Avitech's product market definition is
                     supported by overwhelming evidence ................................... 6

            3.    Embrex's Suggested Inclusion of Manual Injection
                 Users in the Relevant Product Market is Erroneous
                 and Contradicted By the Evidence ...................................................... 9

    B.    THE FACT FINDER COULD REASONABLY INFER THAT
            EMBREX POSSESSES MONOPOLY POWER FROM ITS
            EXTREMELY HIGH MARKET SHARE AND OTHER
            RELEVANT FACTORS ............................................................................ 15

            1.    Since Expiration of the *Sharma* Patent in 2002,
                 Embrex Has Maintained a Market Share Close to
                 — Percent. Recently, Embrex Has Had Only One
                 Active Competitor, Avitech, Whose Market Share
                 is De Minimis ................................................................................. 15

Page

2.   Embrex's Own Data Shows That It Enjoys a Monopoly
     Level Market Share of — Percent or Higher ...................................   17

3.   The Fact Finder Could Properly Infer From Embrex's
     Extraordinarily High Market Share That It Possesses
     Monopoly Power ............................................................................   20

     a.   Embrex's attempt to avoid the inference of
          monopoly power that flows from its near 100
          percent market share is unpersuasive legally
          and unsupported factually .....................................................   21

4.   Barriers to Entry and Expansion are High, Which Validates
     An Inference of Monopoly Power That Flows From Embrex's
     Very High Market Share ...................................................................   25

5.   Summary:  The Threat to Competition and Consumer Welfare
     Posed By Embrex's Anti-Competitive Conduct is Severe ................   27

C.  EMBREX'S FILING AND MAINTENANCE OF A BASELESS PATENT
     INFRINGEMENT LAWSUIT IS EXCLUSIONARY CONDUCT THAT
     VIOLATES SECTION 2 ....………………………………………………   28

1.   The Relevant Evidence of Record ...................................................   28

     a.   The patents and Embrex's monopoly ....................................   28

     b.   Embrex has employed a host of anti-competitive
          lease tactics to maintain its monopoly .................................   30

     c.   When Avitech threatened to win over a major
          Embrex customer, Embrex filed the North Carolina
          action ....................................................................................   33

     d.   Embrex lacked probable cause at the time of suit to
          believe that Avitech's injectors engage in
          "translational" movement .....................................................   35

Page

e.    Embrex's subjective intent in suing Avitech was to
intimidate Avitech's actual and potential customers
and to raise its costs ............................................................ 40

2.    Embrex's Patent Infringement Lawsuit Was and Is a "Sham." ......... 42

a.    "Objectively baseless" ............................................................ 43

(i)    A jury question exists whether Embrex had
a reasonable basis when it filed suit in
August 2004 to believe that Avitech's
injectors infringe the '979 patent by engaging
in "translational movement" ...................................... 43

(ii)    Controlling Federal Circuit law is that denial
of the alleged infringer's summary judgment
motion does not establish probable cause ................ 44

b.    Subjective intent to misuse the legal process ....................... 45

CONCLUSION .................................................................................................... 47

EXHIBITS

| Number | Item |
|---|---|
| ASJ 1 | Transcript of Deposition of James A. Gerardot, May 29, 2008 - excerpts |
| ASJ 2 | Letter of counsel confirming geographic market stipulation |
| ASJ 3 | Affidavit of Rafael Correa |
| ASJ 4 | Embrex SEC Form 10-Q Sept. 30, 2006 – p.36 |
| ASJ 5 | Embrex marketing, sales and planning documents |
| ASJ 6 | Embrex Inovoject Communication Plan (April 2008) |
| ASJ 7 | Embrex's Responses to Avitech's Discovery Requests Relating to the Embrex Brochure, May 12, 2008 |
| ASJ 8 | Docket sheet for Embrex v. Brueil lawsuit |

Exhibits  *(continued)*

ASJ 9        Embrex spreadsheet re: competitors

ASJ 10       Embrex 2004 SEC Form 10-K – pp. 1-2, 5-6, 9-10

ASJ 11       Embrex market share (Table 1) documents

ASJ 12       Embrex 2005 SEC Form 10-K – p.20

ASJ 13       Embrex Privilege Log  – pp. 1, 86-102

ASJ 14       Transcript of Deposition of Jason Fryar, May 30, 2008 – excerpts

ASJ 15       Transcript of Deposition of Stoney Dorning, June 9, 2006 - excerpts

ASJ 16       Embrex Product Brochure

## TABLE OF AUTHORITIES

Page

**Cases**

Alabama Ambulance Service, Inc. v. City of Phoenix, Alabama,
71 F. Supp.2d 1188 (M.D. Ala. 1999) .................................................................... 22

Anti-Monopoly, Inc. v. Hasbro, Inc.,
958 F. Supp. 895 (S.D.N.Y. 1997) ........................................................... 8

Berlyn, Inc. v. The Gazette Newspapers,
223 F. Supp.2d 718 (D. Md. 2002) .......................................................... 9

Bio-Technology Gen. Corp. v. Genentech, Inc.,
886 F. Supp. 377 (S.D.N.Y. 1995) .......................................................... 42

Boulware v. Nevada Dep't of Human Resources,
960 F.2d 793 (9th Cir. 1992) .............................................................. 44

Brook Group Ltd. v. Brown & Williamson
Tobacco Corp., 509 U.S. 209 (1993) ........................................................ 8

Brown Shoe Co. v. United States, 370 U.S. 294 (1962)........................................ 5

Calloway v. Marvel Entertainment Group,
854 F.2d 1452 (2d Cir. 1988)............................................................... 39

Coast to Coast Entertainment, LLC v. Coastal Amusements, Inc.,
2005 U.S. Dist. LEXIS 26849 (D.N.J.) ...................................................... 8

Cogan v. Harford Memorial Hospital,
843 F. Supp. 1013 (D. Md. 1994)........................................................... 9

Consul, Ltd. v. Transco Energy Co., 805 F.2d 490 (4th Cir. 1986) ...................................... 3

CSU, L.L.C. v. Xerox Corp., 203 F.3d 1322 (Fed. Cir. 2000) ............................................. 42

Drs. Steuer & Latham, P.A. v. National Medical Enterprises, Inc.,
672 F. Supp. 1489 (D.S.C. 1987)........................................................... 9

**Cases**   *(continued)*

Eastman Kodak Co. v. Image Technical
          Services, 504 U.S. 451 (1992) ............................................................... 13, 15

Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,
          365 U.S. 127 (1961)................................................................................ 42

FilmTec Corp. v. Hydranautics,
          67 F.3d 931 (Fed. Cir. 1995)................................................................ 43, 44

FTC v. Arch Coal, Inc.,
          329 F. Supp.2d 109 (D.D.C. 2004)........................................................ 5

FTC v. PPG Industries, Inc.,
          628 F. Supp. 881 (D.D.C.)...................................................................... 27

FTC v. Staples, Inc.,
          970 F. Supp. 1066 (D.D.C. 1997)......................................................... 5, 27

Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,
          386 F.3d 485 (2d Cir. 2004).................................................................. 13

Harris Custom Builders, Inc. v. Hoffmeyer
          834 F.Supp. 256 (N.D. Ill. 1993) ......................................................... 45

In re Educational Testing Service,
          429 F. Supp.2d 752 (E.D. La. 2005)..................................................... 20

In re Relafen Antitrust Litig.,
          360 F. Supp.2d 166 (D. Mass. 2005) .................................................... 1, 44
                                                                                                                              *passim*

In re Wellbutrin SR Antitrust Litig.,
          2006-1 Trade Cas. (CCH) (E.D. Pa.)..................................................... 44, 45
                                                                                                                              *passim*

Kirk-Mayer, Inc. v. Pac Ord, Inc.,
          626 F. Supp. 1168 (C.D. Cal. 1986) ..................................................... 21, 22

Lockheed Martin Corp. v. Boeing Co.,
          314 F. Supp. 2d 1198 (M.D. Fla. 2004).................................................. 22

Lockheed Martin Corp. v. The Boeing Co.,
          390 F. Supp.2d 1073 (M.D. Fla. 2005)................................................... 21, 22

*vi*

Page

**Cases**  *(continued)*

National Reporting Co. v. Alderson Reporting Co.,
763 F.2d 1020 (8th Cir. 1985) ............................................. 22

Professional Real Estate Investors v. Columbia Pictures
Industries, Inc. 508 U.S. 49 (1993)........................................ 2, 43
*passim*

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993)................... 2

Stewart v. Sonneborn, 98 U.S. 187 (1878) ........................... 44

Syufy Enterprises v. American Multicinema, Inc.,
555 F. Supp. 418 (C.D. Fla. 1982)........................................ 22, 24

U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,
7 F.3d 986 (11th Cir. 1993) .............................................. 5, 24

United States v. E.I. du Pont de Nemours & Co.,
351 U.S. 377 (1956)....................................................... 5

United States v. Grinnell Corp., 384 U.S. 563 (1966)...................... 25

United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001)............ 8

United States v. Pabst Brewing Co., 384 U.S. 546 (1966) .................. 2

Verizon Communications v. Law Offices of
Curtis V. Trinko, LLP, 540 U.S. 398 (2004) ............................. 9

Virginia Vermiculite, Ltd. v. W.R. Grace & Co.,
108 F. Supp.2d 549 (W.D. Va. 2000)....................................... 39

Warner Lambert Co. v. Purepac Pharm. Co.,
2000 U.S. Dist. LEXIS 22559 (D.N.J.) .................................... 37

Weizmann Inst. of Science v. Meschis,
2004 U.S. Dist. LEXIS 4254 (S.D.N.Y. 2004) ............................. 37

Page

**Statutes**

15 U.S.C. § 2.................................................................................................................... 1, 2


**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................................ 1

Fed. R. Civ. P. 56(e) ........................................................................................................ 10

Fed. R. Evid. 701 ............................................................................................................. 7


**Other Authorities**

1 ABA, Antitrust Law Developments (Sixth ed.) (2007) ..................................................... 13, 25
                                                                                                            *passim*

U.S. Dep't of Justice & Federal Trade Commission,
       Horizontal Merger Guidelines (1997)........................................................................ 14, 21
                                                                                                            *passim*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| AVITECH, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.  WMN 04-CV-3082 |
| | ) | |
| v. | ) | FILED UNDER SEAL |
| | ) | HIGHLY CONFIDENTIAL |
| EMBREX, INC., | ) | SUBJECT TO PROTECTIVE ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AVITECH'S OPPOSITION TO EMBREX'S MOTION**
**FOR SUMMARY JUDGMENT ON AVITECH'S ANTITRUST CLAIM**

Plaintiff Avitech, L.L.C. ("Avitech") opposes the motion of Defendant Embrex, Inc.

("Embrex")[1] for summary judgment on Avitech's antitrust claim, because there are genuine

issues of material fact and Embrex is not entitled to judgment as a matter of law.  *See* FRCP

56(c); In re *Relafen Antitrust Litig.*, 360 F. Supp.2d 166, 178-83 (D. Mass. 2005) (denying

summary judgment due to presence of issues of fact for a jury to resolve concerning the "sham"

nature of patent infringement suit).

**INTRODUCTION**

Embrex filed a patent infringement suit against Avitech in North Carolina federal court

on August 3, 2004.  The case was transferred to this district and later consolidated with Avitech's

original action in this court against Embrex, which seeks a declaratory judgment of patent non-

infringement and asserts a cause of action for "sham" litigation in violation of Section 2 of the

---

[1]     Embrex was acquired by Pfizer Inc. in January 2007 and is now known as the
Pfizer Poultry Health Division of Pfizer Animal Health, a Pfizer subsidiary.  (Gerardot Dep. Tr.
7-11) (Avitech Summary Judgment Exhibit [hereinafter "**ASJ Exh.**"] 1)

Sherman Act, 15 U.S.C. § 2, and its state law counterpart. *See Professional Real Estate Investors v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993).

In this brief and accompanying exhibits, Avitech demonstrates that there is substantial, credible evidence by which a reasonable jury could render a verdict in favor of Avitech on its monopolization and attempted monopolization claims. That evidence shows that Embrex's lawsuit was and is a purposefully exclusionary act by an overwhelmingly dominant firm which lacked probable cause to sue and which deliberately sought to use litigation as a means to burden its only market rival with higher costs, intimidate the rival's prospective customers and reinforce existing market barriers to entry and expansion; and that Embrex's lawsuit has succeeded in causing serious harms to Avitech and the competitive process generally. At the very least, when viewed in a light most favorable to Avitech as it must be in the present posture, that evidence and inferences reasonably arising from it are sufficient to create genuine issues of material fact for a jury to resolve at trial.

## THERE IS SUFFICIENT EVIDENCE FOR A JURY TO FIND IN FAVOR OF AVITECH ON EACH ELEMENT OF ITS CLAIMS OF MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION BY SHAM LITIGATION.

The unilateral offenses prohibited by Section 2 of the Sherman Act, 15 U.S.C. § 2, monopolization and attempted monopolization, have similar but slightly different elements.[2] The core elements of a Section 2 violation are two-fold: monopoly power and exclusionary

---

[2]      To prove a claim of monopolization, a plaintiff must show that the defendant (1) possesses monopoly power and (2) has enhanced or maintained that power by the use of exclusionary conduct. *Verizon Communications v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). To prove a claim of attempted monopolization, a plaintiff must show (1) predatory or anticompetitive conduct; (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

conduct. In this brief and accompanying exhibits, Avitech demonstrates that there is sufficient credible evidence for the fact finder to conclude that:

A.     within a properly defined relevant market, namely, the provision of automated in ovo injection machines in the United States;

B.     Embrex possesses monopoly power and/or a dangerous probability of achieving such power; and

C.     Embrex has engaged in exclusionary conduct consisting of, *inter alia*, filing and maintaining a baseless patent infringement lawsuit with the intent of injuring Avitech and competition generally.

## A.     UNDISPUTED EVIDENCE SHOWS THAT THE RELEVANT MARKET IS THE PROVISION OF AUTOMATED IN OVO INJECTION MACHINES IN THE UNITED STATES.

To determine whether monopoly power exists, it is necessary to define a market in which such power is to be appraised. Thus, a threshold requirement is that an antitrust plaintiff establishes the parameters of a "relevant market" that the defendant has monopolized or attempted to monopolize. *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986), *cert. denied*, 481 U.S. 1050 (1987). A relevant market has two dimensions, geographic and product. Here, the parties have stipulated to the former and there is substantial evidence as to the latter.

### 1.     The United States is the Relevant Geographic Market.

Embrex does not dispute Avitech's definition of the relevant geographic market as being the United States as a whole. (*See* **ASJ Exh. 2**) (letter confirming the parties' stipulation).

2.    **The Relevant Product Market is the Provision of Automated In Ovo Injection Machines.**

Embrex disagrees with Avitech's proposed product market definition but, as shown below, the issue in dispute is neither genuine nor material: Embrex fails to offer any evidence to support a different product market definition; and in any event, <u>under either party's view of the product market, the undisputed facts show that Embrex possesses a sufficiently high market share to enable a reasonable jury to infer that it has monopoly power.</u>

Avitech defines the relevant product market as the provision of automated in ovo injection machines, which are used to vaccine poultry eggs. (First Amended Complaint, ¶ 20; Affidavit of Rafael Correa ["Correa Aff."] ¶ 11) (**ASJ Exh. 3**) Embrex's dispute with Avitech's definition—which is based simply upon argument of its counsel—is about whether "users" of non-automated (manual) injection should be included in the market. Specifically, Embrex argues: "Embrex also competes against poultry processors that use manual processes to fulfill their in ovo [in egg] inoculation needs." (Mem. at 24; *see id.* at 25: "... the record undisputably (sic) shows that ... customers substitute manual in ovo processes for in ovo injection machines")

There are two problems with Embrex's argument. First, it is patently wrong. Manual vaccination *does not involve injecting into eggs at all.* (Correa Aff., ¶ 12) Instead, after hatching, the live chicks are held by laborers who manually inject them one-by-one using a hand held injector/needle. (*Id.*) There are no known "manual in ovo [injection] processes" and <u>no products other than the parties' machines that inject vaccine into eggs.</u> (*Id.*)

Second, the only factual support that Embrex offers for its assertion that manual post hatch injection competes with automated in ovo injection machines, is a citation to a single page of a deposition transcript that *does not even discuss the matter.* (*See* Embrex Mem. at 24, *citing* ESJ Exh. 4 (Correa Dep. Tr., at p. 206)) Obviously, this "evidence" is insufficient to create a

genuine issue that Avitech's proposed market definition is erroneous. Avitech is therefore

entitled to denial of Embrex's motion for summary judgment on the issue of market definition,

without more. Nevertheless, Avitech makes an affirmative evidentiary showing, detailed below,

that its definition of the relevant market is well founded.

      a.      **Relevant product markets, generally.**

The relevant product market is the market that the defendant allegedly seeks to

monopolize. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). To determine the

relevant product market, the factfinder needs to examine the ability of consumers to substitute

other products for the allegedly monopolized product. As the Supreme Court stated in *United*

*States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956), the relevant market "is composed

of products that have reasonable interchangeability for the purposes for which they are produced

-- price, use and qualities considered." *Id.* at 404. The "outer boundaries" of a product's market

are defined by the "reasonable interchangeability of use . . . between the product and its

substitutes." *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 995 (11th Cir. 1993),

*quoting Brown Shoe Co. v. United States*, 370 U.S. 294 (1962). The general question is

"whether two products can be used for the same purpose, and if so, whether and to what extent

purchasers are willing to substitute one for the other." *FTC v. Staples, Inc.,* 970 F. Supp. 1066,

1074 (D.D.C. 1997) (quotation omitted). If two products are not interchangeable, then they are

not in the same relevant market. As the court in a recent case, *FTC v. Arch Coal, Inc.*, 329 F.

Supp.2d 109, 119 (D.D.C. 2004), stated:

> Determining interchangeability is relatively straightforward. Courts compare
> the use or function of defendant's product with other products and then assess
> "the degree to which buyers are willing to substitute those similar products for
> the [test] product. (citation omitted)

**b.** **Avitech's product market definition is supported by overwhelming evidence.**

Avitech's product market definition is supported by overwhelming evidence of record, consisting of: (i) internal Embrex documents that invariably identify and describe the company's competitors as other producers of automated in ovo vaccine injection machines; and (ii) the testimony of Avitech's co-founder and managing member, Rafael Correa, who oversees the company's marketing of its competing machine, the Intelliject® system.

In both internal and external communications, Embrex always describes its competitors as other in ovo injection machine makers. For example, Embrex says:

- "The Inovoject® system uses a process that was patented in the United States by the USDA in 1984. We held the exclusive license to the Sharma Patent until June 2002, when the Sharma Patent expired. With the expiration of the Sharma Patent, *competitive in ovo delivery systems are being developed and marketed.* … Although there has not been widespread commercial acceptance of any of these competing systems, we are aware of direct competition for customers and limited commercial placements by some of these companies, including with some of our customers." (Embrex, Inc. SEC Form 10-Q, Sept. 30, 2006, at p.36 (**ASJ Exh. 4**) (emphasis added)

- Embrex considers itself to be in the "————————" and describes other in ovo injection machine firms, such as Avitech and Breuil, ——————. (E22558) (**ASJ Exh. 5**)

- A typical Embrex sales document promotes the company's position vis-à-vis the "competition" this way: "————————————————————————————————." (E25329) (May 25, 2005 marketing presentation to Gold Kist) (**ASJ Exh. 5**)

- Embrex's most recent U.S. marketing plan for its Inovoject machine contains a ———————————————— (E30781-822) (Embrex  Inovoject Systems Communication Plan, Apr. 9, 2008, at pp. 9-10) (**ASJ Exh. 6**)

6

Embrex's exclusive focus upon competing in ovo injection machine makers is regularly

and invariably reflected in its marketing presentations to poultry breeders. For example:

● In the October 17, 2005 and April 3, 2006 marketing presentations to ————, then
an Avitech customer, Embrex describes ————————————————
———— and explains the ————————————————
————————————————. (E25262, E25248) (**ASJ Exh. 5**)

Rafael Correa's testimony[3] confirms what Embrex's internal communications indicate:

the U.S. market is today comprised of two specialized firms that provide automated in ovo

vaccine injection machines, Embrex and Avitech. (Correa Aff., ¶¶ 11, 20) (**ASJ Exh. 3**) A third

company, Brueil, abandoned the U.S. market in or before 2006, and is believed by Embrex to be

in bankruptcy. (*Id.*, ¶ 20) Another small firm, ServoSystems USA, apparently still exists but has

withdrawn from active solicitation of new business. (*Id.*) There are no commercial products or

devices that are practical substitutes for the specialized automated injection machines

manufactured and leased by these firms to growers of poultry broilers. (*Id.*, ¶ 11-12) Producers

or users of low cost manual injection devices—essentially, hand held needles that cost a few

dollars each—do not compete with producers of half million dollar injection machines. (*Id.*, ¶

---

[3]      Mr. Correa is qualified to express his beliefs about industry and market facts
through first-hand knowledge gained and observations made while conducting the day-to-day
affairs of Avitech, to wit: He founded Avitech in 2001 after careful study of the poultry
growing industry and its vaccination practices and methods. (Correa Aff., ¶ 8) He contributed
materially to the technical development of Avitech's automated technology for in ovo injection,
the Intelliject™ system. (*Id.*) He has personally communicated about vaccination matters with
scores of U.S. poultry growers and visited dozens of hatcheries for technical inspections and
marketing presentations. (*Id.*) He has read widely in the commercial and technical literature
concerning poultry vaccination methods, problems and issues. (*Id.*) He regularly reviews trade
press articles dealing with poultry vaccination. (*Id.*) He is personally familiar with the practical
advantages, benefits and costs associated with manual and automated methods of vaccination.
(*Id.*) He is knowledgeable about factors that influence growers' ability and incentives to
substitute automated vaccination in place of manual injection. (*Id.*) He has participated in field
tests where machines of Avitech, Servoject and/or Embrex were in use. (*Id.*) In short, his
testimony is admissible under Fed. R. Evid. 701 (allowing lay opinion that is "rationally based
on the perception of the witness").

13) A small but significant and sustained increase in the price of such machines would not cause customers to switch to the non-automated (manual) injection method. (*Id.*, ¶ 18-19)

Embrex argues (Mem. at 25-26) that the testimony of a lay witness like Mr. Correa about market facts such as these must be validated by an economist, but the Supreme Court has indicated that expert opinion is not a necessary predicate to a successful antitrust claim. *See Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them"). Other courts hold this same view. *See, e.g., Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 904-05 (S.D.N.Y. 1997), *aff'd* 130 F.3d 1101 (2d Cir. 1997), *cert. denied*, 525 U.S. 813 (1998) ("Experts are not always essential to defining the relevant market"), *citing United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966) (government need not prove "by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market"); *cf. Coast to Coast Entertainment, LLC v. Coastal Amusements, Inc.*, 2005 U.S. Dist. LEXIS 26849 at *56 & n.21 (D.N.J.) (citing cases on both sides of the issue and deciding that although expert testimony may be useful but is not necessary). Not surprisingly, the Fourth Circuit has never held that lay opinion is insufficient to establish a relevant market in an antitrust case. And the only district court in this Circuit that has directly addressed the issue concluded that "there is no per se rule

that an antitrust economics expert is required in all antitrust cases." *Virginia Vermiculite, Ltd. v.*

*W.R. Grace & Co.*, 108 F. Supp.2d 549, 576 n.16 (W.D. Va. 2000).[4]

Expert testimony is not needed to dispute the single relevant market issue raised by

Embrex, namely, whether post-hatch manual injection is a good substitute for automated in ovo

injection, such that users (producers) of manual injection devices must be included in the

relevant product market. The issue is neither complex nor difficult, and its resolution does not

demand any sort of technical economic analysis. To the contrary, it is simple, straightforward

matter that can be resolved by applying a handful of undisputed facts of record, shown below.

### 3. Embrex's Suggested Inclusion of Manual Injection Users in the Relevant Product Market is Erroneous and Contradicted By the Evidence.

Embrex contends that

> "[i]t is Avitech's burden to show that [manual injection] should be excluded
> from the relevant market, but Avitech can offer no evidence concerning the
> scope, nature, frequency of use, or variety of [that] alternative process."
> (Embrex Mem. at 24)

---

[4]      A passage from an unpublished opinion of a judge in this district implies that expert testimony may be necessary, *see Berlyn, Inc. v. The Gazette Newspapers*, 223 F. Supp.2d 718, 727 & n.3 (D. Md. 2002) (stating that "to prove [the] relevant market, expert testimony is of utmost importance, and that testimony, *or any other evidence*, must be based upon specific facts pertaining to the proposed market"). In the next part of its opinion, however, the court retreats from that view, describing the task of the proponent of lay opinion in such a matter as "difficult" and then proceeding to examine other, non-testimonial evidence of market definition proffered in that case. *Id.* Nor do the several other opinions of other district courts in this circuit cited by Embrex (Mem. at 25) establish a legal rule that expert opinion on relevant product market definition is required. *See Cogan v. Harford Memorial Hospital*, 843 F. Supp. 1013, 1020 (D. Md. 1994) (stating, without case citation, that "[t]o allow a jury to make a finding as to the <u>geographic</u> market, Cogan must provide the Court with expert testimony on this highly technical economic question"); *Drs. Steuer & Latham, P.A. v. National Medical Enterprises, Inc.*, 672 F. Supp. 1489, 1512 n.25 (D.S.C. 1987), *aff'd* 846 F.2d 70 (4th Cir. 1988) (merely suggesting that when the plaintiff physician disclaimed any understanding of how to define a relevant <u>geographic</u> market, the absence of expert testimony argued in favor of summary judgment).

This contention is misguided. First, Embrex has not adduced any evidence that Avitech's proposed definition of the relevant market is too narrow or lacks support in the record, so the burden of producing evidence to dispute Embrex's "manual injection" argument does not even shift to Avitech. *See* FRCP 56(e). Second, there *is* abundant evidence of record indicating that manual injection is not properly included within the relevant product market. Thus, at the very least, there is a genuine issue of material fact for the jury to resolve at trial.

To begin, competition in the injection machine market occurs in respect to poultry sold to food processors for consumption by consumers. (Correa Aff., ¶ 10) (**ASJ Exh. 3**) In the trade such chickens are called "broilers," as distinguished from chickens that are raised for laying eggs, which are known as "layers." (*Id.*) In terms of raw numbers, broiler chickens constitute 99 percent of all chickens hatched in this country. (*Id.*) Consequently, sellers of *in ovo* vaccine injection machines like Embrex and Avitech concentrate their marketing efforts upon firms that hatch broilers. (*Id.*) These firms are of two general types: large integrated companies such as Perdue Farms that operate large numbers of hatcheries, often in multiple states, and who also grow chickens and process them into foodstuffs; and small independents who operate hatcheries in local areas. (*Id.*)

Embrex suggests that the relevant product market is poultry injection by both automated and manual means. Embrex also contends that marketers of injection machines *compete with their own customers*—poultry hatcheries. (*See* Embrex Mem. at 24) This is absurd on its face

and ignores basic commercial realities.[5]  By analogy, no one would seriously contend that sellers of tractors compete with farmers who use horse-drawn plows or that sellers of cars compete with people who ride bicycles.  For the overwhelming majority of farmers, a horse-drawn plow is not a practical alternative to a tractor; and for most automobile drivers a bicycle is not a practical alternative to a car.  Likewise, although it is possible for broiler producers to vaccinate live chicks manually, industry economics dictate use of automated, labor saving equipment.

Embrex's manual injection canard is exposed by two basic market facts, each well known in the industry:  (i) virtually all U.S. broiler producers have converted to automated injection; and (ii) having converted, it is not feasible for them to switch back to manual injection.

Avitech's Rafael Correa testifies:  automated technology has been available to U.S. growers for several decades, beginning around the time of initial commercialization of the injection method reflected in the *Sharma* patent.  (Correa Aff., ¶ 15)  In the first stage of industry development, when Embrex was the sole U.S. producer of automated equipment, the machine supplier's objective was to persuade growers that pre-hatch machine injection is a superior method to post-hatch manual injection.  (*Id.*)  This is now a foregone conclusion.  Virtually all growers now understand that automation is far superior in terms of cost, efficacy and ease of administration.  (*Id.*)  Today, every major poultry grower and nearly every independent producer

---

[5]       Embrex's argument violates a basic principle of relevant market definition:  that is, even if (as Embrex erroneously suggests) manual injection effectively competes with machines, then *producers* of injector devices (needles) would be included in the relevant market, not the *users* of such devices (poultry growers).  *See U.S. Anchor Mfr., supra,* 7 F.3d at 995 ("Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.") (quotation and citation omitted).

have converted to automated in ovo injection. (*Id.*) [6] Moreover, there is no recent case in which a machine user switched back to manual post-hatch injection. (*Id.*)

Embrex's own internal documents confirm that by 2005, if not earlier, effectively the

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ :

- As early as March 2004 Embrex concluded that there were only a "▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (E22954) (**ASJ Exh. 5**)

- May 2004: "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬." (E23210) (**ASJ Exh. 5**)

- October 2004: "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. ▬▬▬▬▬▬▬▬." (E23426) (**ASJ Exh. 5**)

- By February 2005, conversion to automated injection (and Embrex's domination of the market) was so complete that ▬▬▬▬▬▬▬ "▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬." (E22643) (**ASJ Exh. 5**)

- October 2005: "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." (E23107) (**ASJ Exh. 5**)

- December 2005: "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." (E23116) (**ASJ Exh. 5**)

- January 2006: "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬." (**ASJ Exh. 5**)

- March 2006: "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬." (E23130) (**ASJ Exh. 5**)

---

[6]   Only a handful of independent poultry growers in the U.S. rely upon manual post-hatch injection, and often these customers have automated in ovo injection machines in some of their hatcheries. (Correa Aff., ¶ 16)  The hold-outs typically are operators of small hatcheries with modest production which do not want to incur the transaction costs of converting to an automated system, such as installing adequate electrical power supply, field testing the machines, negotiating lease contracts, and training machine operators. (*Id.*)

There is little doubt about why broiler producers view in ovo injection as the only viable method of vaccinating poultry. Manual post-hatch injection is not an effective substitute for a machine because it is a less effective and more time consuming and costly method. (Correa Aff., ¶ 17) Among other advantages, machines make fewer mistakes than humans; they vaccinate eggs at rates many times greater than humans; and the overall per egg cost of leasing machines is far less than the cost of employing workers to manually inject chicks. (*Id.*) It is hardly surprising, therefore, that suppliers like Avitech do not take into account the price of manual injectors when establishing machine lease prices. (*Id.*)

Moreover, conversion is a one-way street: manual to machine only. Manual injection is not a practical or reasonable substitute for in ovo machine injection for any of the nearly 100 percent of U.S. poultry growers that rely upon automated vaccination.[7] As Rafael Correa explains, it would take months to assemble a workforce of laborers trained in manual injection, even assuming that it would be economically viable to hire them, which is unlikely. (Correa Aff., ¶ 18) Broiler production is a low margin business with "——————————." (E23130) (**ASJ Exh. 5**) As Embrex frequently notes in its internal marketing analyses, ——————— ———————————, and conversion to manual injection would only increase head counts and result in higher costs. As one senior Embrex official succinctly explained: "————————————————————." (E25335; *see*

---

[7]     This means that the market is characterized by a very low "cross-elasticity" of demand—poultry growers would not switch to manual injection even if injection machine prices rose significantly. *See Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 469 (1992)(discussing concept); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 497-99 (2d Cir. 2004) (inelastic demand for product indicates that it is a separate relevant product market). *See generally* 1 ABA, *Antitrust Law Developments* (Sixth) 563 (2007) ("courts often use the term [cross-elasticity of demand] in a more general, nonquantitative manner to refer to the tendency of an increase in the price of one product to increase the quantity demanded of a second product within a reasonably short time. … Many lower courts and the FTC have relied upon the concept of cross-elasticity of demand in defining relevant markets").

13

E23130) (**ASJ Exh. 5**)  Indeed, Embrex's customers need labor savings so much that they even
want "━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━." (E25339) (**ASJ Exh. 5**)

Economically speaking, the pertinent question is:  would hatchery operators who use
automated in ovo injection machines switch back to manual post-hatch injection if a hypothetical
firm that controls the supply of machines were to increase the price of machines by a significant
amount over an appreciable period of time?[8]  By analogy, this is like asking, would professionals
who use computers to compile and assess financial data resort to paper and pencil if the price of
computers increased by a large amount over a long period of time?  The question seemingly
answers itself:  of course not.  Having invested the time and money to obtain a computer and
become proficient in its use, and having experienced the efficiencies that electronic data
recording and calculation entail, a rational person would not revert to the older, costlier and more
time consuming method.

Likewise, the answer to the hypothetical price increase question here is clearly "no."
Indeed, the poultry industry has already answered the question conclusively, in that nearly all
growers have converted to automated injection machinery because the labor-intensive alternative
is not viable.  Simply put, it takes too long and costs too much to hire, retain, train and supervise
workers for that job.

The bottom line is that if, as is the threat here, a dominant machine producer like Embrex
would raise machine lease prices by a significant amount (and assuming that there were no
sellers like Avitech able to undersell it),  then broiler producers would have no practical
alternative but to pay the supra-competitive price.  This means that there are no products that are

---

[8]     This is the same hypothetical that analysts and courts posit when constructing a
relevant market in antitrust merger cases.  *See U.S. Dep't of Justice & Federal Trade
Commission, Horizontal Merger Guidelines* § 1.11 (1997) [hereinafter, *Merger Guidelines*]),
available online at http://www.usdoj.gov/atr/public/premerger.htm.

reasonably "interchangeable" with automated *in ovo* injection equipment. Therefore, the provision of automated in ovo injection machines is a relevant product market.

**B.      THE FACT FINDER COULD REASONABLY INFER THAT EMBREX POSSESSES MONOPOLY POWER FROM ITS EXTREMELY HIGH MARKET SHARE AND OTHER RELEVANT FACTORS.**

There is clear, credible and substantial evidence supporting Avitech's claim that Embrex possesses monopoly power: Embrex's overwhelmingly dominant market share in the presence of substantial barriers to entry.

**1.      Since Expiration of the *Sharma* Patent in 2002, Embrex Has Maintained a Market Share Close to — Percent. Recently, Embrex Has Had Only One Active Competitor, Avitech, Whose Market Share is De Minimis.**

The essential and undisputed fact is that Embrex has enjoyed a near — percent share of the U.S. market for in ovo vaccine injection machines at all times since 2002, when the *Sharma* patent expired and competition in the U.S. became possible. Under accepted antitrust law principles, a reasonable jury could infer from Embrex's dominant market share, as well as other relevant economic factors, that Embrex possesses monopoly power sufficient to violate Section 2. *See Kodak, supra*, 504 U.S. at 481 ("Respondents' evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is, however, sufficient to survive summary judgment under the more stringent monopoly standard of § 2").

Embrex implies that there are multiple producers of in ovo injection machines in the U.S. but fails to identify any producers other than Avitech that currently are making new sales. That is because there are no other sellers who compete with Embrex in this market. (Correa Aff.,

¶ 20)   Other than Embrex, Avitech is the only active supplier of automated in ovo equipment to poultry growers operating in the U.S.[9]  This has been true since at least 2006.  (Correa Aff., ¶ 20) (*See, e.g.*, E09518) (**ASJ Exh. 5**)  Indeed, Embrex's most recent "▬▬▬▬▬▬▬"▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.  (*See* E30773-30822, at pp. 8-20) (**ASJ Exh. 6**)  Yet, after nearly seven years of competing in the market, Avitech has managed to make only a very small number of sales; its market share by any measure is *de minimis*.  (Correa Aff., ¶ ¶ 22, 24 )

Before 2003, Embrex's internal documents make little mention of machine competitors in the U.S.  In early 2003, an Embrex's top Inovoject marketing manager reported that:

"▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬."  (E22558) (**ASJ Exh. 5**) (January 2003 monthly market report of Jason Fryar)

Until Avitech began to market its Intelliject® machines in 2003, Embrex had ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.  (*See* E23358) (**ASJ Exh**. 5)  Both of those two firms have long since fallen by the wayside, unable to succeed financially:

Brueil:  after making only a handful of U.S. sales mostly to one customer (Tyson Foods), Breuil abandoned the U.S. market several years ago.  (Correa Aff., ¶ 20)  In 2003 Embrex sued the company in North Carolina federal court for patent infringement, and Brueil later defaulted. (*See* **ASJ Exh**. **8**) (docket sheet for C.A. No. 5:03-cv-914, W.D.N.C., *Embrex, Inc. v. Breuil,*

---

[9]     *Cf.* Embrex's Answers to Request for Admission No. 2 (**ASJ Exh. 7**) (admitting that it "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬.") ▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬.

*S.A.,* noting at # 151 that a default entered against Breuil).  Embrex now describes Brueil as

"————." (E30187) **(ASJ Exh. 9)**

ServoSystems:  has not pursued new sales in recent years and its current business activity

consists of servicing a handful of existing machine placements.  (Correa Aff., ¶ 20)  Embrex

describes ServoSystems as "————————." (E30187) **(ASJ Exh. 9)**

Today, Embrex has approximately ——— in ovo injection machines operating in the U.S.

market and annually derives more than $— million in revenues from those machine placements.

(*See* Table 1 at subsection 2 *infra*)  Avitech has invested more than $——— million to date and, in

seven years of competing, is only barely profitable on a current basis and has yet to recoup more

than a tiny fraction of its total investment.  (Correa Aff., ¶ 25)  Avitech currently has ———

machines under lease to U.S. customers—the most that it has ever had at any one time—and has

about $——— million in annual machine revenues.  (*Id.*)  Under these measures (revenues and unit

placements), Avitech's market share is in the range of ——— (—) to ——— (—) percent.

The whole rest of the U.S. market—some ————— percent—belongs to Embrex.  That

is a monopoly-level share under any and all Sherman Act case law precedent.

> **2.** **Embrex's Own Data Shows That It Enjoys a Monopoly Level Market
> Share of ——— percent or Higher.**

Embrex periodically calculates its share of the market by measuring the percentage of

total U.S. egg vaccinations that are achieved by its machines—a hold over from the days when it

was the sole U.S. supplier.  But even under this measure, Embrex's market shares are — percent

or higher, which is well above the lower range of monopoly-level market share.

In internal documents, Embrex personnel frequently note the fact of its ━━━━━━━ ━━━━━━━━━━━━━━━━━━━━━━ over time, which have actually *increased* during the period since Avitech began competing in the market.  For example:

- In its 2003 Business Plan, Embrex stated: "━━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━."  (E25032) (**ASJ Exh. 5**)

- In his October 2004 monthly report, an Embrex Inovoject salesman was able to conclude that "━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ ━━━."  (E23426) (**ASJ Exh. 5**)  He added: "━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━━━━━━━━━━━━━━━━━."  (*Id.*)

- This was publicly confirmed by Embrex in its 2004 Annual Report ("The company estimates that its *Inovoject® system inoculates in excess of 80% of all eggs produced for the U.S.* and Canadian broiler poultry markets.") (**ASJ Exh. 10,** at p. 6)

- Embrex's dominance of the submarket of large volume customers has been even greater. In its business plan for 2005, Embrex stated a goal for its North American operations to "━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━." (E25510) (**ASJ Exh. 5**)

- Embrex was able to maintain its very high market share despite the entry of several competitors into the U.S. market: "In addition, Embrex is aware of four companies that are marketing in ovo injection systems to poultry companies. *Although there has not been widespread commercial acceptance of any of these competing systems*, the company is aware of direct competition for customers and limited commercial placements by two of these companies." (2004 SEC Form 10-K, at p. 6) (**ASJ Exh. 10**)

- Embrex June 2005: "━━━━━━━━━━━━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━━━━━━━━━━━━━━━."  (E23087) (**ASJ Exh. 5**)

- In a December 2005 sales summary, Embrex's top Inovoject marketer confidently predicted: "━━━━━━━━━━━━━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━━━━━━━━━."  (E23494) (emphasis added) (**ASJ Exh. 5**)

The foregoing narratives are reflected in Embrex's own market share data, which the firm regularly compiles and disseminates internally to senior management.  The data estimate Embrex's share of total vaccinated "U.S. Broilers" measured in terms of eggs vaccinated by its machines.  The data for 2002-2006 are as follows:

**Table 1:  Embrex's Inovoject Market Share - U.S. Broilers** [10]

| Year End | Installed Machines | Eggs Vaccinated | Market Share (%) | Machine Revenues ($) |
|---|---|---|---|---|
| 2002 | ▬▬ (E21697) | ▬▬▬ (E23666) | ▬▬ | ▬▬▬ (E23666) |
| 2003 | ▬▬ (E21812) | ▬▬▬ (E23719) | ▬▬ | ▬▬▬ (E23719) |
| 2004 | ▬▬ (E25602) | ▬▬▬ (E23060) | ▬▬ | ▬▬▬ (E23117) |
| 2005 | ▬▬ (E23118) | ▬▬▬ (E23117) | ▬▬ | ▬▬▬ (E23117) |

Embrex data for calendar years ending 2006, 2007 and 2008 has not been produced to Avitech, *see* E24130 (**ASJ Exh. 5**) (market share documents produced only through August 2006), and Embrex has not yet supplemented its production.  Nevertheless, as Embrex's own documents suggest, the data for these more recent periods would likely show ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬ :

- Embrex, North America Monthly Report Feb. 2006 ("▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬.") (E09194) (**ASJ Exh. 5**)

- Embrex, 2006 Financial Performance at 22 ("▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬") (E25179) (**ASJ Exh. 5**)

- Embrex, 2006 Global Sales Summary, US/Canada at 6 ("▬▬▬▬▬▬ ▬▬▬▬▬." (E25162) (**ASJ Exh. 5**)

---

[10]     The documents referenced in the table are collected at **ASJ Exh. 11.**  Embrex's market "universe" for the "eggs vaccinated" data ▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬.  If manually injected eggs were excluded from the calculation, then its actual market shares would be even higher than as shown.

- Embrex, 2005 SEC Form 10-K at p.20 (March 2006) ("We estimate that our Inovoject® system inoculates approximately 85% of all eggs produced for the U.S. and Canada broiler poultry markets.  Given this market penetration, *we expect only limited growth in the number of system installations and only minor system revenue growth in this market*.") (**ASJ Exh. 12**)

Likewise, in a 2007 Embrex planning document, Embrex concluded that the Avitech had yet to gain even a "━━━━━━━━━━━━━━━━━." (E25348) (emphasis added) (**ASJ Exh. 5**)  In these circumstances, to characterize Avitech's competitive posture (not to mention that of ServoSystems)[11] as precarious and fragile would be an understatement.

### 3.   The Fact Finder Could Properly Infer From Embrex's Extraordinarily High Market Share That It Possesses Monopoly Power.

It is well-accepted that the existence of market/monopoly power (and/or a "dangerous probability" of achieving such power) can be inferred from a very high market share such as Embrex possesses. *See, e.g., United States v. Grinnell Corp., supra*, 384 U.S. at 571 ("The existence of such [monopoly] power ordinarily may be inferred from the predominant share of the market"; finding monopoly power in the presence of an 87 percent market share); *Eastman Kodak Co. supra*, 504 U.S. at 464, 481 (same; holding that a fact finder could infer monopoly power from an 80 percent or higher market share).  "The case law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of market power." In re *Educational Testing Service*, 429 F. Supp.2d 752, 756 (E.D. La. 2005).

---

[11]     ServoSystems has had even less success in penetrating the market than Avitech. (*See* Correa Aff., ¶ 20)  Although we do not have complete information to enable a computation of ServoSystems' current machine placements, there is no doubt that they constitute no more than a handful. (*Id.*)  Not surprisingly, ━━━━━━━━━━━━━━━━━━━━.

      **a.**     **Embrex's attempt to avoid the inference of monopoly power that flows from its near ——— percent market share is unpersuasive legally and unsupported factually.**

Unable to dispute the fact of its monopoly-level market share, Embrex invites this Court to find that the parties participate in a peculiar type of market in which "market share has no influence on a competitor's ability to win future bids." (Embrex Mem. at 28)  Embrex suggests that its market share should be ignored because, as may be the case in certain unique "bidding" markets, the parties here "have an equal likelihood of securing sales." (*Id.* at 27-28, *quoting Merger Guidelines* § 1.41 n.15).  Embrex's argument, however, is a frolic and detour:  the "bidding market" cases cited by Embrex are factually inapposite, and other courts have expressly rejected the rule of law that Embrex thinks they stand for, namely, that in bidding markets "a high or dominant market share does not confer monopoly power."

It is true that there are unique economic markets in which a single entity—most commonly, a *governmental* agency—acts as a "monopsony" purchaser, *i.e.*, a buyer who possesses the power to dictate price and quality terms to sellers (and who is thus able to prevent the contractor-sellers from exercising market power).  *See Lockheed Martin Corp. v. The Boeing Co.*, 390 F. Supp.2d 1073, 1080 (M.D. Fla. 2005).  There is a small, older and readily distinguishable line of antitrust cases that discuss this special type of market.  *See Kirk-Mayer, Inc. v. Pac Ord, Inc.*, 626 F. Supp. 1168, 1170 (C.D. Cal. 1986) ("Few cases have analyzed market power in this context, *i.e.*, an exclusive, fixed-price government contractor for a fixed

term"). These are the cases cited by Embrex. (*See* Embrex Mem. at 26-27)[12] They stand for the

narrow proposition that when a government contractor obtains a contract for a fixed term at a

fixed price in open bidding against a number of other bidders, the contractor does not have the

power to control prices or exclude competition. *See Kirk-Mayer, supra*, 626 F. Supp. at 1170-

72. Manifestly, that is not this case.

Furthermore, even if, *arguendo*, the government bidding scenario present in the cases

cited by Embrex were apt, the courts have squarely rejected the idea that one can never exercise

monopoly power in such a market. *See Lockheed Martin Corp. v. Boeing Co., supra*, 390 F.

Supp.2d at 1080 ("This Court has already refused to adopt a *per se* rule that monopoly power

cannot be achieved in a 'fixed-term, fixed-price bidding market'"); *id.*, 314 F. Supp.2d at 1230

("None of these cases [*National Reporting et al.*] supports Defendant's contention that the winner

of 75% of the contracts in a fixed-term, fixed-price bidding market can *never* be shown to have

dangerous market power"). *See also Syufy Enterprises v. American Multicinema, Inc.,* 555 F.

Supp. 418, 426 (C.D. Fla. 1982) (rejecting the argument that "the unilateral action of an exhibitor

cannot give rise to liability for monopoly" in a competitive bidding market).  In sum, there is no

legal support for the proposition that Embrex advances, namely, that "Embrex's historically high

market shares are legally insufficient, by themselves, to raise a genuine dispute concerning

---

[12]     All of the cases Embrex cites are based upon the rationale in *National Reporting Co. v. Alderson Reporting Co.*, 763 F.2d 1020 (8th Cir. 1985). *See Lockheed Martin Corp. v. Boeing Co.*, 314 F. Supp. 2d 1198, 1230 (M.D. Fla. 2004) (discussing later cases such as *Alabama Ambulance Service* and *Kirk Mayer* (cited by Embrex)). In *National Reporting*, an unsuccessful bidder brought Sherman Act § 2 charges against the successful bidder for the court reporting services contract of the United States Tax Court. The contracts were only for one-year terms and the Tax Court's policy was to allow the incumbent contractor to renew the contract if it agreed to do so at no increase in price and was rendering satisfactory services. The Eighth Circuit held that "Alderson could not control prices, because if it tried to raise its price, the contract would again be up for bids." *Id.* at 1023.  Further, there were "other court-reporting companies who can bid and try to undercut the company holding the contract." *Id.* Thus, there also was no power in the incumbent contractor to exclude competition.

Embrex's market power." (Embrex Mem. at 28)  Thus, for this reason alone, Embrex's motion must be denied because it would not be entitled to judgment as a matter of law on a theory that Embrex's market shares are irrelevant in this case.

Moreover, the facts of record in this case belie Embrex's flawed legal theory.  Embrex mistakenly characterizes the automated in ovo injection machine market as a "bidding" market. The market is, instead, a common type of market in which goods used by businesses are distributed through short term leases, and in which potential customers solicit offers on lease terms from potential suppliers. (Correa Aff., ¶ 14)  There are many such markets in this country and elsewhere, for products as diverse as computers, automobiles and trucks, software, office furniture and equipment, and many others. (*Id.*)  No one has ever suggested that it would be impossible to exercise market power/monopoly power in markets such as these.

Moreover, in the actual market in which the parties compete, Embrex has real, large and numerous advantages over new entrants like Avitech, which make the likelihood of their securing new sales far from equal to that of Embrex.  Some of these advantages flow from Embrex's position as the dominant incumbent supplier, but others—ones that harm rivals like Avitech the most—are the result of a deliberate effort by Embrex to maintain its monopoly by erecting artificial barriers to entry and expansion.

As explained in greater detail in section C.1.b., *infra*, Embrex's response to the emergence of competitors in the U.S. in the early years of this decade was to adopt a host of anti-competitive leasing tactics designed to force poultry growers to use Embrex's machines exclusively. (Correa Aff., ¶ 28)  Embrex's marketing plans describe these actions part and parcel of an "▬▬▬▬▬▬" policy that it consciously designed "▬▬▬▬▬▬" of new rivals. (E23897) (**ASJ Exh. 5**)  Embrex's leasing tactics have included:  prohibiting customers' use of

23

competitive machines during lease term; prohibiting customers from disclosing lease prices to

rival machine suppliers; disabling Embrex machines to prevent side-by-side competitive trials;

increasing prices when a customer leases a competitive machine; imposing long term leases to

"lock in" customers; and requiring mandatory "no out" clauses. Embrex's actions have not only

actually succeeded in raising barriers to entry and expansion to new rivals such as Avitech, but

also likely were a factor in forcing Brueil into bankruptcy and ServoSystems into abandoning

active sales. (Correa Aff., ¶ 29)[13]

Even in those few cases when Avitech is able to avoid or surmount those obstacles,[14] it

faces other significant competitive disadvantages that Embrex does not face. Avitech must

persuade a potential customer to test its machines because no buyer will replace its existing

Embrex machines without seeing the new machine work in place and over time. (Correa Aff., ¶

24) Field testing normally consumes several months or more and requires a substantial

commitment of manpower and time by the grower's hatchery personnel. (*Id.*) Often, to

convince a potential customer to incur this burden and expense, Avitech has to subsidize the

trials by placing several machines in the customer's facility free of charge for the life of the trial.

---

[13]     Embrex's success in imposing its exclusive supplier policy and driving rivals
from the market is <u>direct</u> evidence of monopoly power, *i.e.,* the power to control prices or to
exclude competition. *See United States v. E.I. duPont de Nemours & Co., supra,* 351 U.S. at
391; *Syufy Enterprises, supra,* 555 F. Supp. at 424 ("AMC also demonstrated that Syufy
possessed an essential hallmark of monopoly power, the power to exclude competition, through
evidence that Syufy had successfully created barriers to entry").

[14]     Embrex's brief recites examples where it has occasionally lost sales or had to
lower its prices due to competition from Avitech or (previously) other machine suppliers. That
kind of anecdotal evidence hardly proves that Embrex lacks monopoly power. It is a truism that
monopolists do not always and everywhere flex their economic muscles to defeat rivals' selling
efforts—even dominant sellers sometimes loses sales to smaller rivals (otherwise, monopolists
would always have all of the sales in a market). Indeed, no one would seriously contend that a
firm with less than 100 percent of a market cannot monopolize in violation of Section 2, but that
is what that Embrex's anecdotes are intended to imply.

(*Id.*) Assuming that field testing satisfies a grower that Avitech's machines compare favorably to Embrex's, then Avitech must negotiate price and other terms sufficient to convince the buyer to lease its machines. (*Id.*) This is the point in time that Embrex targets to aggressively defend its incumbent position: when Embrex learns[15] that the customer is seriously considering leasing Avitech's machines, it routinely attempts to blunt Avitech's potential inroad by offering heavily discounted lease renewal terms in return for long term "no out" leases. (*Id.*) And, if Avitech survives those gauntlets, the customer must then remove Embrex's existing machines, install Avitech's machines and train its workers to use the new machines. (*Id.*) All of these factors impose significant inconveniences and costs upon the growers, which often make them unwilling to displace incumbent Embrex machines. (*Id.* )

It is thus not true, as Embrex claims, that the parties have an "equal" likelihood of making new sales. There are persuasive legal and factual reasons for rejecting Embrex's contention that its continuously high market share is irrelevant to its ability to win future sales.

### 4. Barriers to Entry and Expansion are High, Which Validates An Inference of Monopoly Power That Flows From Embrex's Very High Market Share.

Barriers to entry are "either a cost that would have to be borne by an entrant that was not and is not borne by the incumbent or any condition that is likely to inhibit other firms from entering on a substantial scale in response to" an exercise of market power.  1 ABA, *Antitrust Law Developments* 233 (2007).  Evidence of barriers to entry in addition to a predominant

---

[15]      Embrex's machines are saturated in hatcheries throughout the U.S. and its many sales and service personnel regularly ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━. (*See, e.g.*, E22586-89) (**ASJ Exh. 5**) Embrex has had detailed and contemporaneous information about everything that Avitech is doing to market its machines; whereas the opposite is not true—Avitech has had only a handful of field sales personnel and limited ability to monitor Embrex's sales activities. (Correa Aff., ¶ 24)  The opportunities available to Embrex to hinder and prevent Avitech from displacing incumbent Embrex machines throughout this often lengthy selling process are many.

market share fortifies the inference of monopoly power because impediments to entry allow the

dominant firm to raise prices without attracting new competitors to undercut it.  *See United*

*States v. Microsoft Corp.*, 253 F.3d 34, 56-57 (D.C. Cir. 2001) ("monopoly power may be

inferred from a firm's possession of a dominant share of a relevant market that is protected by

high entry barriers"); 1 *Antitrust Law Developments* 233-34  ("Where barriers to entry are

significant, courts are more likely to find monopoly power.").  Entry barriers are high unless

"entry would be timely, likely, and sufficient in its magnitude, character and scope to deter or

counteract the competitive effects of concern."  *Merger Guidelines* § 3.0.

There is no realistic possibility that new entry or expansion[16] will constrain Embrex's

long run ability to exercise monopoly power.  Entry barriers are high—high enough to render the

likelihood of timely and profitable entry unlikely.  (Correa Aff., ¶ 26) (estimating that it would

require a new entrant today to invest 10-15 years and $25 million to achieve profitable size and

sales).  In addition to the artificial barriers erected by Embrex pursuant to its "exclusive supplier"

leasing tactics, *id.*, ¶ 28, other, more conventional barriers to entry exist by reason of large long

run capital costs required to support ongoing research and development, manufacture complex

machines and support ongoing marketing and other activities; large minimum scale of production

needed to operate profitably; and customers' field testing requirements and use of multi-year

leases.  (*Id.*, ¶¶ 23-24).  All of these factors significantly limit the ability of new rivals' to win

sales from a dominant incumbent like Embrex.

---

[16]      1 ABA, *Antitrust Law Developments* 233-34 ("barriers to expansion of existing
firms … also are relevant to the monopoly power inquiry").  Avitech has documented the
existence of significant barriers to expansion in this market.  *See* section B.3.a., *supra* (detailing
unique costs and conditions that a firm like Avitech seeking to challenge Embrex's dominant
position must bear and surmount in order to convert existing Embrex customers).

Embrex's own analysis of entry conditions admits that barriers to new entry are more than high enough to allow it to exploit its market power:

"▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬." (E25330) (**ASJ Exh. 5**)

*See FTC v. PPG Industries, Inc.*, 628 F. Supp. 881, 885 (D.D.C.) (finding high entry barriers by reason of two to six year lead time required to acquire technological expertise, assemble trained personnel and devise tooling), *aff'd in part and rev'd in part on other grounds*, 798 F.2d 1500 (D.C. Cir. 1986); *Merger Guidelines* § 3.10 ("The Agency generally will consider timely only those committed entry alternatives that can be achieved within two years from initial planning to significant market impact.").

Unable to surmount these barriers, Breuil and (effectively) ServoSystems exited the market after competing for only a few years (Correa Aff., ¶¶ 20, 29) and apparently without recovery of their sunk costs (such as by selling assets to a new entrant)—market facts which themselves indicate that barriers to entry in this market are high. *See, e.g., FTC v. Staples, Inc., supra,* 970 F. Supp. at 1087.

### 5. Summary: The Threat to Competition and Consumer Welfare Posed By Embrex's Anti-Competitive Conduct is Severe.

As evidenced by its persistently high market share in the presence of high barriers to entry, Embrex's dominance of the U.S. market for in ovo injection machines is complete and overwhelming. Avitech is Embrex's only current U.S. competitor, and its relative financial and competitive status is exceedingly fragile. The upshot is clear: if Embrex were to mortally wound or destroy Avitech by this sham patent litigation and/or other anti-competitive conduct, then Embrex would resume its position as the only U.S. supplier and achieve a monopoly.

C.  **EMBREX'S FILING AND MAINTENANCE OF A BASELESS PATENT INFRINGEMENT LAWSUIT IS EXCLUSIONARY CONDUCT THAT VIOLATES SECTION 2.**

Sham litigation is exclusionary conduct that violates Section 2 when performed by a defendant possessing market power. Based upon the evidence, a reasonable jury could find that that Embrex's patent infringement action was an objectively baseless lawsuit brought in bad faith and with a subjective intent to monopolize the market for in ovo vaccine injection machines.

1.  **The Relevant Evidence of Record**

   a.  **The patents and Embrex's monopoly.**

The *Sharma* patent

Since the late 1980s, Embrex was the exclusive licensee, with the right to sue for patent infringement, under U.S. Patent No. 4,458,630, issued July 10, 1984, which names Sharma *et al.* as the inventors. The claims of the *Sharma* patent relate to a method for controlling an immunizable disease in avian species such as chickens by injecting a vaccine into an embryonic egg ("in ovo injection").

The '979 patent and Embrex's Inovoject machine

The '979 patent, issued August 11, 1992, entitled *Modular Injection Systems for Avian Embryos,* which relates to an injection apparatus and method for injecting poultry eggs of varying sizes and which may be presented to the injection apparatus in differing orientations. Embrex has developed and sells an automated in ovo injection machine known as Inovoject that is based upon the *Sharma* and '979 patents. Embrex's installed base of machines covers every major broiler grower and most independents in the U.S.

28

Embrex's patent monopoly expires in July 2002

The Sharma patent expired in July, 2002.  For the first time in the U.S. market, competitors emerged to challenge Embrex's market dominance.  Several firms including a French company, Breuil, began to display their machines at trade shows in the U.S.  (E22558) **(ASJ Exh. 5)**

Avitech enters the market with an innovative new machine

Avitech is a small, minority-owned and operated enterprise located in Salisbury, Maryland, on the state's eastern shore.  (Correa Aff., ¶ 5)  Its members include Rafael Correa, who is also a founder, shareholder and manager of a successful machine tooling business there, Machining Technologies, Inc. [Matech].  (*Id.*, ¶ 3)  Matech's machine expertise and its location in one of the most important poultry production centers in the United States inspired Avitech's principals to form the company in 2001 to compete in the automated in ovo injection machine business.  (*Id.*, ¶ 6)

Avitech spent thousands of man hours and millions of dollars to research and develop a new in ovo injection system, the Intelliject® machine.  (Correa Aff., ¶ 24)  The machine combines several new technologies to insure maximum biosecurity, accuracy, and vaccine stability.  (*Id.*, ¶ 7)  Compared to Embrex's machine, Avitech's Intelliject® machine is less expensive to lease and performs equally well or better.  (*Id.*) (*See* —————————) **(ASJ Exh. 5)**  Avitech first displayed its new Intelliject® machine at a leading industry trade show in January 2003.  (Correa Aff., ¶ 15)  Avitech then began actively calling upon poultry growers throughout the U.S. to solicit sales of its machines, and almost immediately began encountering fierce resistance from Embrex.

**b.** **Embrex has employed a host of anti-competitive lease tactics to maintain its monopoly.**

Embrex argues that "there is no evidence that Embrex did anything other than assert its valid patent rights and engage in legitimate competition against Avitech." (Embrex Mem. at 31) That is incorrect. There is overwhelming evidence that Embrex's response to the emergence of U.S. competitors such as Avitech was to implement a host of anti-competitive leasing tactics designed to force customers to use Embrex's machines exclusively. Embrex's marketing plans describe these measures as its "——————" policy that is "——————————" and would be "———————————." (E23897) (**ASJ Exh. 5**) These tactics have succeeded in impeding the ability of Embrex's rivals to compete. (Correa Aff., ¶¶ 28-29)

Embrex's anti-competitive leasing tactics have included:

Prohibiting customers' use of competitive machines during lease term

Embrex ——————————————————————————————————————————————." (Embrex Mem. at 8; *see, e.g.*, E24470) Embrex says that sometimes—when it suited its purposes—————————————————————————————————————————————————. (*Id.; but cf.* E11857) (**ASJ Exh. 5**) (indicating that Embrex considered "——————————"—————————————————) Even when ————, however, Embrex has actively tried to persuade customers to "—————————————————," (E23901) (**ASJ Exh. 5**), knowing that if its machines ———————————————————————————————————————. (E22561) (**ASJ Exh. 5**)  Nevertheless, this exclusivity requirement has been in force for most customers since the U.S. market opened to competition in late 2002. (Correa Aff., ¶ 28) This restriction has

impeded rivals' ability to market their products by limiting contracting opportunities to the end
dates of existing leases.  (*Id.*)

Prohibiting customers from disclosing lease prices

   Embrex's standard leasing practice is to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ lease Embrex's machines.  (*See, e.g.*, E20232-33, E20445;
E20746) (**ASJ Exh. 5**)   This restriction hinders the ability of rivals such as Avitech to engage in
informed and candid price negotiations with potential customers, armed with knowledge of the
prices they must meet or exceed to win the customers' business.  (Correa Aff., ¶ 28)

Disabling Embrex machines to prevent side-by-side competitive trials

   In February 2003, soon after Avitech's successful debut of the Intelliject® machine at the
International Poultry Exhibition, Embrex started "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬."  (E22560) (**ASJ
Exh. 5**)  This policy was expected to be "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬."  (E22561) (**ASJ Exh. 5**)  Embrex believed that if its policy "▬▬▬▬▬▬▬▬▬▬▬
l▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬."  (*Id.*)  The policy made it difficult or impossible for a
customer to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, *id.*, thereby depriving the customer of
material information upon which to base a leasing decision.  The policy was communicated to
"▬▬▬▬▬▬▬▬▬▬▬▬▬" in early 2003.  (E09214) (**ASJ Exh. 5**)

Increasing prices when a customer leased a competitive machine

   When other measures failed to dissuade a customer from leasing a competitive machine,
sometimes Embrex would ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬.  (E22674; E09236) (**ASJ Exh. 5** )

Long term leases to "lock in" customers

As early as December 2001, Embrex was already contemplating measures to protect is dominant market position after expiration of the *Sharma* patent by selectively ━━━━━━━ ━━━━━━. (E23899) (**ASJ Exh. 5**)  By early 2005 Embrex's top Inovoject marketing manager, Jason Fryar, had concluded that Avitech's machine performance in customers' hatcheries was ━━━━━━━━━━━━━━━━━━━━. (E22643) (**ASJ Exh. 5**)  He believed that Embrex "━━━━━━━━━━━━━━━━━━━━━━━━" (*Id.*)  He saw a need for Embrex to look at the "━━━━" of "━━━━" if "━━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━━━." (*Id.*)  Embrex then began obtaining long term leases to minimize possible defections of customers and, thereby, limit the opportunities of rivals to displace Embrex's machines.  The goal of this new policy was to "━━━━━━━━━━━━━ ━━━━━━━━━━━━━━━." (E09558) (**ASJ Exh. 5**)  The idea was to "━━━ ━━━━━━━━━━━━━━━━━━━━━━━━━━━." (*Id.*) The policy has been Embrex's "━━━━" since 2005.  (E23290; E09589) (**ASJ Exh. 5**)  It has been successful in "━━━━━━━━━━━━━━━━━━━." (E22954; *see* E23210; E23799; E23810) (**ASJ Exh. 5**)

Mandatory "no out" clauses

Embrex's long term leases ━━━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━━━━━━━━━━━━━━━━ ━━━━━━━━━━━━. (*See, e.g.*, E23030) (**ASJ Exh. 5**) ("━━━━━━━ ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

——————"). The longer the lease, ——————————————————

———————————————————————. (E23903) (**ASJ Exh. 5**)

       **c.**    **When Avitech threatened to win over a major Embrex customer,**
            **Embrex filed the North Carolina action.**

Embrex's anti-competitive leasing tactics significantly impeded Avitech's ability to win customers, but they did not succeed in eliminating Avitech as a competitor. Embrex decided to increase the pressure upon Avitech by filing a patent infringement suit.

Avitech solicits Perdue

Avitech believed that a key to successful U.S. marketing would be to win a contract with a large poultry producer, Perdue Farms, which is located in Avitech's "back yard" in Salisbury, MD. (Correa Aff., ¶ 21) (**ASJ Exh. 3**)  Avitech expected that other large growers would be favorably inclined to test the Intelliject® machine if Avitech had won business from Perdue. Avitech therefore concentrated much of its early marketing efforts upon Perdue. (*Id.*)  Perdue was and is one of Embrex's most important U.S. customers. (*Id.*)

Embrex decides to sue Avitech

In or before February 2003—literally within weeks of Avitech's entry into the market— Embrex began planning for litigation against Avitech. Embrex's management instructed its marketing and sales personnel to ————————————————————————

———————————————————————. (E22560) (**ASJ Exh. 5**)  In April and May 2003, Embrex learned that ——————————————————————————

——————————————————. (E22562; E22567) (**ASJ Exh. 5**)  Embrex closely monitored Avitech's ——————————————————————. (E22568; E22571) (**ASJ Exh. 5**)  In July 2003, Embrex's top Inovoject marketing manager, Jason Fryar, completed "——————

33

————————————" and sent it to ————————(E22577) (**ASJ Exh. 5**), which

approved filing a lawsuit against Avitech.[17]   In September 2003 Embrex's president and chief

executive officer, Randall Marcuson, began ——————————————————

————————————. (E23995) (**ASJ Exh. 5**)  For tactical reasons, Embrex decided to

————————————————————————————

————————. (E22560) (**ASJ Exh. 5**)


November 2003-July 2004: Perdue field tests the Intelliject® system in Maryland

In November 2003, Perdue proposed to lease two Avitech machines for ninety days for

field testing in Maryland and, if successful, Perdue would have an option to renew the lease for

those machines or buy/lease others.  (Correa Aff., ¶ 21) (**ASJ Exh. 3**) Avitech agreed and the

Maryland field tests ensued. (*Id.*)  The testing took longer than expected.  In July 2004, Embrex

learned that ————————————————. (E22610) (**ASJ Exh. 5**)


August 3, 2004:  Embrex files the North Carolina action

The showdown over the Perdue trials occurred on August 4, 2004, when Embrex's sales

team ——————————————————————————

————————————————————. (E23026) (**ASJ Exh. 5**)[18]  The day

before the meeting, Embrex filed a bare bones notice complaint in federal court in North

Carolina (later transferred and consolidated with this action) claiming that Avitech's Intelliject®

system infringes the '979 patent. (*Embrex, Inc. v. Avitech, L.L.C.*, No. 1:04CV00693, M.D.N.C.)

---

[17]    *See also* Embrex's Privilege Log, Item No. 427 (July 14, 2003 document; first
assertion of privilege for document "prepared in anticipation of litigation") (**ASJ Exh. 13**)

[18]    Like many other contemporaneous documents produced by Embrex in this case,
the report ——————————————— (E23026-28) (**ASJ Exh. 5**) has been heavily redacted.

("the North Carolina action").   The filing enabled Embrex to tell Perdue at the meeting that the Eagle Springs lease would involve infringing goods, thereby embroiling Perdue in patent litigation that could be avoided by not doing business with Avitech.   At the time, Embrex knew and believed that there was "━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━."   (E01663; *see* E23026) (**ASJ Exh. 5**)   When Perdue refused to back down from its decision to lease machines from Avitech, Embrex served the lawsuit papers upon Avitech.

### d.      Embrex lacked probable cause at the time of suit to believe that Avitech's injectors engage in "translational" movement.

The alleged invention of the '979 patent was to provide an injection apparatus in which individual eggs are injected from floating injectors in which each injector can orient itself both horizontally (or "translationally") and vertically to an individual egg even where the eggs are of different sizes and may be presented in slightly different orientations.   To succeed in proving infringement, Embrex must establish (among other things) that Avitech's injectors engage in translational movement; without translational movement there can be no infringement. Consequently, no reasonable person would have sued Avitech for patent infringement without first satisfying himself that there was an objective basis for believing that the Intelliject® machine injectors move translationally.

Embrex initiated this action with no probable cause to believe that there was any such movement.   There were two sources of facts known by or available to Embrex prior to filing:  (i) analysis of the static structure/design of the machine; and (ii) visual observation of the machine while in operation.   All such facts would have led a reasonable person to conclude that Avitech injectors move only vertically, *i.e.,* they have no translational movement.

35

Unquestionably, the geometry of the Intelliject® machine would necessarily lead a reasonable person to conclude that Avitech intended the machine injectors to have vertical only movement.[19] The Intelliject® machine includes a rod-shaped injector that slides vertically within an opening on a support plate. When the support plate moves down, carrying the injector with it, the injector hits the egg, the plate continues downward, and the injector slides vertically within the opening. Then, the injector is gripped tight by an inflatable ring that surrounds the injector within the support plate to maintain the injector stable before the injector needle is activated to pierce the egg. Inflation of the gripper ring that surrounds the injector causes any possibly misaligned injector to return to a purely vertical direction. No rational person would design the injector to move translationally when it would return to pure verticality after inflation of the gripper ring (but before injection)—such return would cancel out any marginal pre-grip horizontal injector motion and in the process likely also break the egg.

The only other objectively determinable evidence available to Embrex prior to suit was a visual examination of the Intelliject® machine while in operation during field tests in Maryland in 2003.[20] When one views the machine in operation, however, it is impossible to detect anything other than vertical movement of the injector within the closely confined support plate opening.[21]

---

[19]    Given that this Court has already issued an opinion interpreting the claims of the '979 patent and denying the parties' cross-motions for summary judgment of infringement, this brief assumes the Court's familiarity with the patent and the parties' claims.

[20]    As early as November 2003, Embrex recognized that ▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (*See* E22584) (**ASJ Exh. 5**) ("▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.")

[21]    Embrex knew that when operating injectors are viewed by the human eye, there is "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬." (E32248; *see* E22699) (**ASJ Exh. 5**).

Embrex does not contend that prior to filing suit in August 2004 it obtained a report from an expert mechanical engineer who examined the machine and concluded that Avitech injectors move translationally.[22] Its testimonial expert witness, Professor Sturgis, was not even retained by Embrex ━━━━━━━━━━━━━━━━━━━━━━━━━

━━━━━━━━━━━━━━━━━━━━the first time Embrex inspected a working machine and took video-electronic measurements. (*See* E22745) (**ASJ Exh. 5**) Moreover, when Professor Sturgis was engaged, he lacked knowledge of the injector technology at issue; he first began receiving "━━━━━━━━━━━━━━━" ━━━━━━━━━━━━━━━━.

(E22736) (**ASJ Exh. 5**)

In short, all of the objectively determinable evidence available to Embrex prior to suit—analysis of machine structure and visual inspection of the injectors in operation—would have pointed to the fact that Avitech's injectors move only vertically. A reasonable person would not have believed that Avitech's injectors infringe the '979 patent based upon that evidence.

Embrex's post-filing actions reinforce the conclusion that at the time of suit it lacked probable cause to sue for infringement. As this Court will recall, Embrex defended its plan to inspect an Intelliject® machine at a Gold Kist hatchery in Alabama by claiming that Avitech may have widened the holes in the tooling plate in a machine being leased to Foster Farms in California, in purpose or effect thereby creating a "second version" of the injector system.

---

[22]     Embrex shielded its entire pre-filing "investigation" from discovery by claiming attorney-client privilege for all documents and communications that disclose its relevant knowledge and actions, if any. (*See, e.g.,* Fryar Dep. Tr. 20, 25-26) (**ASJ Exh. 14**) (witness who was Embrex's primary in-house contact for the infringement lawsuit instructed on grounds of privilege not to answer question: "Do you recall if you ever actually inspected the Avitech machine [before the lawsuit was filed]?") Having blocked Avitech from access to that evidence, however, Embrex is estopped from relying upon it to counter Avitech's showing that Embrex lacked probable cause to sue. *Cf. Weizmann Inst. of Science. v. Neschis,* 2004 U.S. Dist. LEXIS 4254 at *10 (S.D.N.Y. 2004) (and cases cited).

(Notably, the fact of a second version has never been proved and, indeed, the idea of a second

version was never thereafter asserted by Embrex again.)  In opposing the inspection, Avitech

argued that this "second version" notion was a pretext to harass Gold Kist, which was about to

commit to an initial lease of machines from Avitech.[23]  (One would rightfully ask, as Avitech did

at the time, if that widened hole claim were genuine, why would Embrex not seek to inspect the

machine allegedly widened, the one at Foster Farms?  The answer is, Foster Farms was already

an Avitech customer, whereas Gold Kist still had not made a final decision to go with Avitech in

place of Embrex.)  In any event, Embrex's inspection is itself a tacit admission that nearly two

years into the lawsuit it still had no objective evidence of infringement by translational

movement:  if Embrex needed to inspect a supposedly modified Avitech embodiment to prove

infringement, it obviously recognized and believed that the preexisting "unmodified" Avitech

design did not infringe.

Later, the parties each moved for summary judgment on the infringement issue.

Embrex's expert contended that in the working Intelliject® machine at Gold Kist that he

examined using video electronic measurement (as opposed to the manufacturing drawings, which

Embrex has never cited as evidence of infringement) the opening in the injector support plate

may be slightly (several human hairs) wider than necessary for pure verticality, thus leaving

---

[23]     When opposing Avitech's motion for a protective order to prevent the Gold Kist
inspection, Embrex submitted a declaration of an employee, Stoney Dorning, to persuade the
Court that its translational movement theory in respect to this so-called second machine might be
supportable.  When later deposed, Dorning confirmed that his inspection of the Avitech machine

▬▬▬▬▬.  (Dorning Dep. Tr. 4, 5, 22-23, 44-64) (**ASJ Exh. 15**)  But translational motion
is not and cannot be produced when the injector is resting on the tooling plate by gripping the
bottom of an injector and wiggling it.  As this Court has specifically found, to argue as Embrex
did that the translational movement contemplated by the patent can occur when the upper portion
of the injector is resting in the engaged tooling plate, "is unsupported by the language of the
patent specification."  (Memorandum opinion of Dec. 21, 2006, Dkt. Entry # 113, at p. 12)
Dorning's wiggling was utterly misguided if not plainly a ruse to justify the inspection.

open the possibility of minimal side-to-side injector movement.[24]   This Court denied both

parties' motions by refusing to credit one expert's opinion over the other's.  But there is no doubt

that Embrex's carefully crafted "evidence" cannot be equated to any *pre-filing* facts known or

believed by Embrex, which are what matter.  *Cf., Warner Lambert Co. v. Purepac Pharm. Co.*,

2000 U.S. Dist. LEXIS 22559 at *15-16 (D. N.J.) ("denial of summary judgment denial, in and

of itself, cannot deem litigation objectively reasonable without specific examination of the basis

for denial of summary judgment").

Embrex has pursued this litigation while knowing that there is no translational movement

by the Avitech injectors.  In an internal document dated December 2007, an Embrex employee

reported that ████████████████████████████████████████████████████████████,

████████████████████████████████████████████████████████████."  (E32248-

49) (**ASJ Exh. 5**) (*See* Fryar Dep. Tr. 101-02) (**ASJ Exh. 14**)  And, when Embrex's top

Inovoject marketing manager was recently asked at deposition if he had ever seen any post-filing

study or analysis that indicated otherwise, he testified that ██████████████████████

████. (Fryar Dep. Tr. 106-07) (**ASJ Exh. 14**)

---

[24]    Professor Sturgis' opinion is grounded upon the spurious, result-oriented notion
that "there is clearance and then there is too much clearance." He parses mechanical clearance
into a series of (literally) hair-splitting gradations and draws an arbitrary line to distinguish
infringing injector movement from non-infringing movement. Significantly, he cannot define
where horizontal movement due to clearance ends and translation movement due to free floating
begins, but he swears that he knows movement that is translational when he see it. His is a
modern day "how many angels can dance on the head of a pin" argument that only an
academician could embrace and that a reasonable jury could find to be objectively baseless. *See
Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1473 (2d Cir. 1988), *rev'd on other
grounds*, 493 U.S. 120 (1989) ("it is ... entirely possible that a baseless factual claim will survive
a motion for summary judgment, particularly where an attorney prepares an affidavit for a client
stating a material fact for which there is no basis.").

Similarly, while continuing to maintain before this Court that Avitech's machine infringes the '979 patent, Embrex has been telling its customers exactly the opposite. In January 2008, Embrex published a new injection equipment Brochure (**ASJ Exh. 16**) that includes a chart comparing the patented features of the Embrex Inovoject machine to those of "others," which Embrex has admitted was a reference to ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Embrex's Answer to Request for Admission No. 1) (**ASJ Exh. 7**), two of which, ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. The Brochure chart states in clear and unqualified language that <u>the movement of the Avitech machine injectors is "vertical only" in contrast to the patented floating translational movement of Embrex's injectors</u>. This statement is a candid admission of non-infringement by Embrex,[25] which a jury could reasonably interpret as confirming other evidence that Embrex's patent infringement suit was objectively baseless when filed.

    e.    **<u>Embrex's subjective intent in suing Avitech was to intimidate Avitech's actual and potential customers and to raise its costs.</u>**

The evidence also shows that Embrex's purpose or motive in suing was to use litigation to injure Avitech in ways collateral to the legal process, namely, to intimidate Avitech's actual

---

[25]    The authors/reviewers of the Brochure were two senior Embrex managers, James Gerardot and Jason Fryar. Their testimony conflicts not only with each other but also with the story Embrex offered when opposing Avitech's motion to reopen discovery, namely, that the Brochure merely restates Avitech's litigation position out of a cautious desire to shield Embrex from a charge of unfair competition or commercial disparagement. ▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (Gerardot Dep. Tr. 48-51, 79) (**ASJ Exh. 1**) Amazingly, the author of the Brochure, Mr. Fryar, testified that he meant that "▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. He says this, although he also claims to believe today that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. (Fryar Dep. Tr. 53-83) (**ASJ Exh. 14**) In other words, despite what he plainly wrote in the Brochure, ▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬! A jury could reasonably view his testimony on these matters as circuitous, evasive and lacking any credibility, and thus as further evidence that Embrex's lawsuit was baseless when filed.

and potential customers, to saddle Avitech with burdensome litigation costs and to reinforce barriers to entry and expansion by rivals.

First of all, there is clear, direct evidence that Embrex viewed the pending lawsuit as succeeding in ways other than through winning on the merits.  In November 2004, just a few short months after the suit was filed (and long before a judgment in the case was foreseeable), Embrex's field personnel noted that ████████████████████████████████████ ████████████████████████████████████████████████.  They reported to Embrex's senior management that ██████████████████████████████████████ ████████████████████████████████████████████████████████," (E23049) (**ASJ Exh. 5**)  This impact has not been confined only to Perdue; many other Avitech customers such as Gold Kist and Foster Farms have reacted in the same way, or even worse by outright refusing to do business with Avitech while Embrex's suit is pending.  (Correa Aff., ¶ 31)

In bringing suit, Embrex also knew and believed that litigation would sorely tax Avitech's ability to defend an expensive and distracting lawsuit while simultaneously trying to gain a foothold in the market.  Embrex understood that intimidating a large potential customer like Perdue presented "████████████████████████████████████████ █." (E1663) (**ASJ Exh. 5**)  Embrex's planning documents show that it well appreciated that a key threat to Avitech's competitive existence was that it would "██████████████." (E23903) (**ASJ Exh. 5**)  A year after filing suit, Embrex calculated that its combined actions aimed at Avitech had ████████████████████████████████████: "████████████████████████████████████████████████." (E23290) (**ASJ Exh. 5**)

The jury would be entitled to consider this evidence in light of other evidence showing that Embrex's broader anti-competitive goal at the time was to "——————" (E23897) (**ASJ Exh. 5**) through its exclusive supplier policies and, thereby, to make it more difficult for emerging market rivals such as Embrex to penetrate the market.

## 2.    Embrex's Patent Infringement Lawsuit Was and Is a "Sham."

A patent owner does not enjoy an unbounded privilege to file infringement lawsuits. *See CSU, L.L.C. v. Xerox Corp.,* 203 F.3d 1322, 1325 (Fed. Cir. 2000), *cert. denied,* 531 U.S. 1143 (2001) ("Intellectual property rights do not confer a privilege to violate the antitrust laws.") An exception to *Noerr-Pennington* immunity exists for lawsuits brought in bad faith, *i.e.,* if suit is a "mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961).

Dominant firms such as Embrex sometimes respond to competition by manipulating the legal process, using litigation as an end in itself—to harass rivals and intimidate those who would deal with them. This kind of litigation is primarily designed to harm competitors rather than to win a judgment. In such cases, the incumbent's purpose is to raise a rival's costs, [26] or to send a warning message to potential competitors, or to deter customers with the prospect of buying into legal problems, or all of those things. The more protracted and expensive the proceeding, the better; the litigant's overriding goal is to harass and impede a newcomer like Avitech and, thereby, to maintain and enhance market dominance.

---

[26]    *See, e.g., Bio-Technology Gen. Corp. v. Genentech, Inc.*, 886 F. Supp. 377, 380 (S.D.N.Y. 1995) (There "is a well recognized type of antitrust injury which [is comprised of] the costs incurred in defending a "sham" litigation filed in violation of the antitrust laws").

The Supreme Court has outlined a two-part definition of sham litigation: a lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and must constitute "an attempt to interfere directly with the business relationships of a competitor . . . through the use [of] the government *process* -- as opposed to the *outcome* of that process -- an anticompetitive weapon." *Professional Real Estate Investors v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993) [ *"PRE"*] (emphasis in original).

### a.   "Objectively baseless"

The Court in *PRE* held that the "objectively baseless" element resembles the inquiry to determine probable cause in the common law tort of malicious prosecution. *Id.* at 62. Probable cause means that "a reasonable litigant in the defendant's position could realistically expect success on the merits of the challenged lawsuit." *Id.* at 63. The Federal Circuit, interpreting this aspect of *PRE*, has held that the appropriate inquiry should explore whether the patentee at the time it filed suit had a reasonable basis for suing. *See FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938 (Fed. Cir. 1995).

### (i)   A jury question exists whether Embrex had a reasonable basis when it filed suit in August 2004 to believe that Avitech's injectors infringe the '979 patent by engaging in "translational movement."

An objectively reasonable litigant in August 2004 could not believe that Avitech's injectors move translationally: such movement is not suggested by the structure of the machine, and it is not visible to the human eye when a machine is in operation. Nor did Embrex have any objective basis for claiming infringement when it sued—it had not even engaged an engineering expert let alone had him or her examine a machine in operation. Thus, its lawsuit is a clear example of a "*sue first and hope to discover later*" a basis for proving infringement. That is the antithesis of probable cause.

43

Where, as here, there is credible evidence that Embrex lacked probable cause when it sued, it is the Court's duty to submit the probable cause question to a jury to decide. *See* In re *Relafen Antitrust Litig.*, 360 F. Supp.2d 166, 179-83 (D. Mass. 2005) (when "facts tending to prove or disprove the existence of probable cause" are in dispute, "it becomes the duty of the trial court to submit the question to the jury"), *citing, e.g., Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878) ("It is, therefore, generally the duty of the court, when evidence has been given to prove or disprove the existence of probable cause, to submit to the jury its credibility. . . .").

Avitech is no less entitled to a jury trial on the issue of probable cause than Embrex is on issue of infringement. Indeed, the two issues are intertwined. Much of the same evidence supporting Embrex's claim of infringement and Avitech's defense of non-infringement will also enable the jury to decide whether there was probable cause to sue in August 2004, *i.e.*, whether there was an objective basis at the time to believe that Avitech's injectors move translationally.

### (ii) Controlling Federal Circuit law is that denial of the alleged infringer's summary judgment motion does <u>not</u> establish probable cause.

Because the probable cause inquiry is essentially retrospective, subsequent events in the lawsuit do not necessarily yield conclusive or even probative evidence that probable cause existed at the time of suit. *See* In re *Wellbutrin SR Antitrust Litig.*, 2006-1 Trade Cas. (CCH) ¶ 75,158 at *33-34 (E.D. Pa.) ("By employing the language of "expectations" the Court [in *PRE*] was indicating that the analysis should focus on what the litigant knew or reasonably could have known at the time the suits were filed, not on the results of the suits"). Thus, the Federal Circuit (whose law controls the issue of a patent owner's liability under antitrust law when asserting infringement) has explicitly cautioned the federal trial courts that a patentee's preliminary success during the lawsuit does not necessarily preclude a sham challenge. *See FilmTec, supra,*

67 F.3d at 938, *citing Boulware v. Nevada Dep't of Human Resources*, 960 F.2d 793, 798-99 (9th Cir. 1992) ("a preliminary success on the merits does not preclude a court from concluding that litigation was baseless"). Accordingly, patent antitrust trial courts have squarely rejected the proposition that Embrex advances here, namely, that having survived a motion for summary judgment on the underlying patent infringement claim, its suit cannot be objectively baseless as a matter of law.[27] One of these case opinions explicitly rejects the rationale of *Harris Custom Builders*—the primary case authority relied upon by Embrex (Mem. at 17-18)—as being irreconcilable with controlling Federal Circuit precedent. *See In re Wellbutrin SR Antitrust Litig., supra*, 2006-1 Trade Cas. (CCH) ¶ 75,158 at *32-34.

### b. Subjective intent to misuse the legal process.

The subjective intent factor in the *PRE* test for sham litigation is satisfied by evidence showing that the litigant "had decided to sue for the benefit of collateral injuries inflicted through the use of legal process." 508 U.S. at 65; *see id.* at 61("use [of] the governmental *process* -- as opposed to the *outcome* of that process -- as an anticompetitive weapon") (emphasis in original; citation omitted).

A jury could reasonably infer that Embrex's motive for suing Avitech was to use the lawsuit as a weapon to inflict two types of collateral injuries upon Avitech. That is, based upon the evidence, the fact finder could readily conclude that Embrex's improper purposes were (i) to intimidate large customers such as Perdue, which was Avitech's first and most important inroad into Embrex's customer base, and whose patronage Avitech had to secure to have any chance to

---

[27]     *See, e.g.,* In re *Wellbutrin SR Antitrust Litig., supra,* 2006-1 Trade Cas. (CCH) ¶ 75,158 at *31-32, 34 (refusing to adopt a per se rule that any action which achieves a certain "measure of success" - in this case, surviving summary judgment motion and securing a preliminary injunction - is, as a matter of law, not "objectively baseless"); In re *Relafen Antitrust Litig., supra,* 360 F. Supp.2d at 179-83 (and cases cited) (same).

become profitable, into rethinking their decisions to do business with Avitech.  (E23049) (**ASJ Exh. 5**) ("————————————————" by causing Perdue to be concerned about the business consequences of leasing Avitech's machines); and (ii) to drive Avitech out of business by depleting its finances.  (*See* E23903) (**ASJ Exh. 5**) (Avitech could "————————————————" which would end its ability to compete)  The reasonableness of these inferences is reinforced by Embrex's failure to conduct an objectively reasonable pre-filing investigation, which is probative of a sham subjective intent.

Moreover, when assessing Embrex's motives for suing Avitech, a jury would be entitled to consider the evidence of improper intent in light of Embrex's pattern of engaging in other, related anti-competitive conduct, including a host of abusive lease tactics that have actually succeeded in raising entry barriers and foreclosing rivals from penetrating the market.  The express goals behind these tactics were generally to "—————" (E23897) (**ASJ Exh. 5**) and specifically to put Avitech "—————." (E23290) (**ASJ Exh. 5**)

At the very least, therefore, there are genuine issues of material fact as to Embrex's subjective intent that preclude summary judgment.

### CONCLUSION

Embrex's motion for partial summary judgment on Avitech's antitrust claim should be denied because there are genuine issues of material fact with respect to each element of the Section 2 offense and Embrex is not entitled to judgment as a matter of law.

June 27, 2008

Respectfully submitted,

AVITECH, L.L.C.

Max H. Lauten
Federal Bar No. 00288
KRAMON & GRAHAM, P.A.
One South St.
Suite 2600
Baltimore, MD 21202-3201
Tel.: (410) 752-6030
Fax: (410) 539-1269
Email: mlauten@kg-law.com

/ s /

By _____
Philip L. O'Neill
Bar No. 08303

Michael R. Slobasky
Harvey B. Jacobson, Jr.
JACOBSON HOLMAN PLLC
400 Seventh St., N.W.
Washington, D.C. 20004-2218
Tel.: (202) 626-4681
Fax: (202) 393-5350

Its Attorneys